LASSER, J.T.C.
International Thomson Business Information, Inc.[1] (Taxpayer) contests the denial of its election to be taxed as an investment company. Corporation Business Tax (CBT) assessments imposed by the Director of the Division of Taxation (Director) for the tax years 1986,1987 and 1988 and Director’s denial of Taxpayer’s 1988 refund claim are in issue. Director denied Taxpayer’s election to be taxed as an investment company under N.J.SA 54:10A-5(f) and 54:10A-4(d). A trial was held on the factual and legal issues.
*412 I
For the tax years in contest, Taxpayer filed New Jersey CBT tax returns pursuant to N.J.SA 54.-10A-1 to -40 and elected on the returns to be taxed as an investment company. An investment company’s CBT is calculated on 25% of the taxpayer’s net income and net worth[2] whereas a regular corporation’s CBT is based on the taxpayer’s entire net income and net worth. N.J.S.A 54:10A-5(d). Director disallowed Taxpayer’s election as an investment company and in a final determination and notice of assessment dated July 16, 1991, assessed Taxpayer $152,838 plus interest for the tax years 1986, 1987, and 1988.
During the tax years in contest, Taxpayer was one of 150 corporations which made up the Thomson Corporate Group. Taxpayer, a Delaware corporation with its principal place of business in New Jersey during the tax years in contest, is a company which holds the stock of its wholly owned subsidiaries. Taxpayer’s subsidiaries are all in the publishing business. In at least one case, a subsidiary of Taxpayer has subsidiaries of its own. Taxpayer is itself a wholly owned subsidiary of International Thomson Organization, Inc., which, in turn, is a wholly owned subsidiary of International Thomson Holdings, Inc.
The following facts for the years 1986-1988 were established by testimony of Taxpayer’s chief executive officer (CEO) and the vice president of tax of International Thomson Holdings, Inc.
Taxpayer is the parent of nine subsidiaries in 1986 and six in 1987 and 1988 (hereinafter referred to as “the subsidiaries”). Taxpayer’s investment in these subsidiaries was:
1/1/86 1/1/87 1/1/88 12/31/88
$48,948,226 $85,011,094 $144,971,279 $144,886,279
Taxpayer’s subsidiaries operate autonomously. Each has its own management, administrative, finance and human resources *413 staffs. Each keeps its own books and files separate state and local tax returns. Each has a different insurance and pension plan, since each had its own plan when it was acquired by Taxpayer.
Taxpayer’s income for the years in question is:
1986 1987 1988
Management Fee[3] $3,097,000 Interest 21,993 $2,675,000 $2,577,000 70,281 ‘ 103,166
Other Adjustments -0-77,685 39,459
Total Net Income $3,118,993 $2,822,966 $2,719,625
In September 1991, Taxpayer filed a protective $15,045 refund claim for 1988 claiming that it overstated its management fee income by $711,825 for that year. In addition, Taxpayer claims it overstated its management fee income by $412,637 and $581,000 for 1986 and 1987, respectively. Director contends, and Taxpayer concedes, that refund claims for 1986 and 1987 are barred by the two-year statute of limitations. Taxpayer asserts, however, that in the event it is determined not to be an investment company, the alleged overpayments should be used to offset any deficiencies in additional tax payments due. Similarly, the protective claim for 1988 was filed in the event taxpayer is found not to be an investment company.
The management fee is an amount Taxpayer charges its subsidiaries for overhead and expenses incurred for overseeing its investment in the subsidiaries. Examples of the charges are Taxpayer’s salaries, rents, employee benefits and travel and entertainment. In justifying the charges for this management fee, Taxpayer’s CEO stated that the subsidiaries receive benefits from their association with a Thomson-affiliated group. Taxpayer’s CEO stated that Taxpayer’s expenses were charged to the subsidiaries because they were for the benefit of the subsidiaries and would have been incurred by the subsidiaries if Taxpayer did not incur them.
*414 Taxpayer also represents the subsidiaries to Taxpayer’s parents, and provides spread sheets to the subsidiaries for a consistent collection of financial data. In addition, Taxpayer communicates the Thomson group’s plans, policies and guidelines to the subsidiaries.
The management fee is allocated to each subsidiary quarterly based on a formula using relative assets and sales. Taxpayer reports the management fee on its New Jersey CBT returns. The management fees are treated as deductible operating costs by each subsidiary on their tax returns.[4]
Taxpayer has seven employees, a chief executive officer, a chief financial officer (CFO) and his assistant, a controller, a business manager and two administrative assistants. Taxpayer’s CEO is responsible for overseeing the profitability of each subsidiary. He establishes annual goals for revenue and return on sales for each subsidiary. Each subsidiary develops its own business plan to meet the goals, how the goals will be accomplished and the financial detail to support the plan.
Taxpayer’s CEO reviews the subsidiaries’ business plans and may reject them or offer suggestions if the plans do not meet growth targets. The planning process is an ongoing, informal relationship between Taxpayer’s CEO and the CEOs of the subsidiaries. The CEO of each subsidiary is responsible for implementing the business plan on a day-to-day basis. Taxpayer’s CEO spends about 50% of his time visiting the subsidiaries and reviewing their progress toward meeting their goals. At times he makes specific suggestions about a magazine’s circulation or rejects a new magazine outright because its return on investment is not satisfactory. Taxpayer’s CEO’s suggestions are to ensure a good return on investment.
Taxpayer’s CEO is also responsible for hiring the subsidiaries’ CEOs and, on at least one occasion, dismissed a subsidiary’s CEO. On that occasion, Taxpayer’s CEO acted as the subsidiary’s CEO *415 until a new person was installed. Taxpayer’s CEO also transferred at least one employee from one subsidiary to another. According to Taxpayer’s CEO’s testimony, he does not become involved in the day-to-day operations of the subsidiaries except for the one instance in which he had assumed the position of CEO of a subsidiary.
Taxpayer’s CEO does not have the authority to approve or disapprove of an acquisition that a subsidiary wishes to make. Those decisions are made by the Taxpayer’s parent. However, Taxpayer’s CEO meets with potential acquisition targets to discuss the benefits of becoming a member of the Thomson corporate group.
Taxpayer’s CFO’s duties include reviewing the subsidiaries’ financial data, investigating abnormal or unusual financial results, analyzing financial aspects of potential acquisitions by Taxpayer and its subsidiaries, coordinating outside auditors and accountants, and visiting the subsidiaries to coordinate them financial reporting with Taxpayer. Taxpayer’s CFO spends approximately 20% to 25% of his time visiting the subsidiaries.
Taxpayer’s Controller is responsible for coordinating the subsidiary financial reports. This includes preparing consolidated financial statements, preparing annual and quarterly standard accounting reports for submission to the parent company, and coordinating group tax matters. Since each subsidiary has its own accounting system, Taxpayer’s Controller developed custom spread sheets for each subsidiary to use in inputting its financial data in order to present a standardized set of data to Taxpayer’s parent.
Taxpayer contends that it was formed by the Thomson Group for the purpose of protecting, maintaining and coordinating the investments in the subsidiaries and all expenses incurred are to support this purpose. Taxpayer states that it does not sell any products or services to any entity. Taxpayer argues that due to the nature of the subsidiaries, it is not possible for Taxpayer, with only seven employees, to be involved in the subsidiaries’ day-today operations.
*416 Director contends that Taxpayer’s involvement with its subsidiaries is more than passive, that through the business planning process and the Taxpayer’s CEO’s personnel decisions, Taxpayer is involved in the day-to-day operations of its subsidiaries. Director’s July 16, 1991, final determination letter states that “[f]or purpose of the income tests, management fee income does not constitute investment type income. Accounting and/or managerial services performed by the Taxpayer on behalf and for its subsidiaries and affiliates would not constitute investment type income.”
II
The threshold issue is whether Taxpayer qualifies as án investment company under the CBT, N.J.S.A. 54:10A-1 to -40. The CBT was enacted in 1945 (A. 1945, c. 162). Assembly bill A464, incorporated into the statutes as A. 1947, c. 50, amended the 1945 CBT. The Act had previously provided special tax treatment under N.J.S.A. 54:10A-5(d) to companies subject to federal regulation under the Federal Investment Companies Act of 1940 which had elected to be taxed as regulated investment companies (RICs) under the Internal Revenue Code. The 1947 Amendment affording non-regulated investment companies special treatment under N.J.S.A. 54:10A — 4(f) was enacted pursuant to the recommendations of the Second Report of the Commission on State Tax Policy which report stated in relevant part:
The original [CBT] legislation in 1945 provided for special treatment of [RICs]____ This special treatment was made on the meritorious ground that the particular type of company involved provided an investment medium for the small investor and was subject to public supervision, as distinguished from other investment companies [that failed to satisfy both of these criteria]____
The merits of the case presented by [RICs] are somewhat related to the question of expediency in the taxation of all investment companies, including the so called personal holding companies. This type of business normally desires to center its activities in the New York financial market, and the principal office of such a business may readily be moved from Jersey City to New York City, and vice versa. Most of the large taxpayers, or potential taxpayers, are Delaware corporations and their only activity usually is represented by the maintenance of a small office and staff, provisioned for receipt and delivery of securities, and maintenance of bank deposits and other types of banking business, a type of business which is concentrated among the banks located in Jersey City. To the extent that our tax law creates a tax liability equal to or in excess of that in New York, this type of *417 company and the financial business it brings to New Jersey tends to move out of the State.
The problem of dealing with investment companies tax-wise is thus not so much a matter of the reasonableness of the tax itself, or even of the loss entañed in making adjustments, since the entire tax yield provided by this class of company is affected when the companies move out of the State. EssentiaUy the problem is that of reaching a working level of taxation which wifi enable New Jersey business to compete in the New York metropolitan financial market. Experience over the past year has shown that a substantial number of the type of financial corporations under consideration have removed from the state during the year.
The Commission accordingly recommends:
THAT THE PRESENT ALLOCATION FACTOR FOR ALL INVESTMENT COMPANIES AND PERSONAL HOLDING COMPANIES, WHETHER DOMESTIC OR FOREIGN CORPORATIONS, BE REVISED. ALL SUCH COMPANIES SHOULD BE ASSESSED FOR FRANCHISE TAX MEASURED BY 25% OF THEIR NET WORTH AT THE SAME RATES AS OTHER CORPORATIONS. IN THE ALTERNATIVE, SUCH CORPORATIONS MAY ELECT TO BE TAXED UNDER SECTION 5(B) AS IT IS PROPOSED TO BE AMENDED.
[New Jersey Comm’n on State Tax Policy, Second Report, at 102-04 (1947).]
It is apparent that special treatment for investment companies was provided in order to encourage investment companies to locate in New Jersey. This policy has remained in effect for more than 45 years. The report identifies investment companies as those that maintain a small office for receipt and delivery of securities and maintenance of bank accounts and other banking business.
The statute defines “investment company” as:
any corporation whose business during the period covered by its report consisted, to the extent of at least 90% thereof of holding, investing and reinvesting in stocks, bonds, notes, mortgages, debentures, patents, patent rights and other securities for its own account ...
[N.J.S.A 54:10A-4(f).]
These business activities are called “qualified investment activities” in N.J.A.C. 18:7-1.15(b). This regulation provides that qualified investment activities are to be measured by “gross receipts and expenses as reported for Federal income tax purposes, and by adding thereto, Federal, state, municipal, and other obligations included in determining New Jersey entire net income, but not *418 otherwise included in Federal taxable income.” N.J.AC. 18:7-1.15(b).
The regulations establish a business test and an asset test to determine the extent to which a corporation has qualified investment activities. If qualified investment activities are 90% or more the corporation qualifies as an investment company for favorable tax treatment. The business test considers: (1) whether the corporation derives 90 percent or more of its total income before deductions reported for Federal income tax purposes from cash and/or investment type assets: (a) adjusted for enumerated sales, interest and capital loss (adjusted income); (b) including interest not otherwise included in Federal taxable income and exclusive of any capital loss (unadjusted income); (2) whether the corporation incurs 90 percent or more of its total deductions as reported for Federal income tax purposes for holding, investing and reinvesting in cash and/or investment type assets (deductions). N.J.AC. 18:7-1.15(F)(1).
The asset test requires that at least 90 percent of gross assets of the corporation located in New Jersey must consist of cash and/or investment type assets. N.J.AC. 18:7-1.15(F)(2).
Taxpayer’s Schedule L of its CBT returns reported the following for its business test and asset test figures:'
1986 1987 1988
Business Test[5]
Adjusted Income 99.29% 94.76% 94.76%
Unadjusted Income 99.29% 94.76% 94.76%
Deductions 100% 100% 100%
Asset Test 99.37% 99.77% 99.80%
III
Determination of Taxpayer’s status as an investment company entitled to favorable tax treatment requires the analysis of Taxpayer’s activities in managing its subsidiaries.
*419 The pertinent regulations require that qualified investment activities and assets may not include activities or assets attributable to “[t]he direct day-to-day management of operations of affiliated corporations or the actual providing of services, directly or as an intermediary, for the benefit of affiliated corporations[.]” N.J.AC. 18:7-1.15(b)(4). To the extent that a corporation has expenses associated with these activities, they must be excluded from the numerator of any business or asset test and if this causes the ratio of any one of the business or asset tests to fall below 90%, the corporation is not entitled to favorable tax treatment.
Taxpayer is a holding company incorporated for the purpose of overseeing and coordinating the activities of the subsidiaries. Taxpayer has seven employees whose function is to monitor the profitability of the subsidiaries. This includes setting and monitoring financial goals, reviewing and approving business plans, and analyzing, on a monthly basis, the financial performance of each subsidiary. The testimony indicates that Taxpayer makes no profit. The management fees that it receives from the subsidiaries are reimbursements for Taxpayer’s costs of overseeing the subsidiaries. The fact that payments from the subsidiaries to Taxpayer were reported on CBT tax returns as management fees led the Director to conclude that Taxpayer was participating in day-to-day operations of the subsidiaries and rendering services to the subsidiaries.
I conclude that the nature of Taxpayer’s involvement with its subsidiaries is more than passive. Taxpayer is involved with more than the maintenance of its subsidiaries’ bank deposits, or the receipt and delivery of securities. Taxpayer acts on behalf of its subsidiaries by representing them to Taxpayer’s parent and by communicating the policies and plans of the parent to the subsidiaries. Taxpayer’s CEO spends about half his time with the subsidiaries. He makes suggestions about magazine circulation and has rejected the introduction of new magazines. Taxpayer’s CEO personally hires the subsidiaries’ CEOs, has fired one CEO and on at least one occasion, transferred another. Taxpayer’s CEO also acted as one subsidiary’s CEO for two months. Tax *420 payer’s CFO spends 25% of his time with the subsidiaries and there is an ongoing dialogue between Taxpayer and the subsidiaries on business plans (which Taxpayer may reject) and financial targets and performance. Taxpayer coordinates legal and tax advice for its subsidiaries, and coordinates and consolidates the subsidiaries’ financial information. Taxpayer also plays an active role in the subsidiaries’ acquisitions, performing financial analysis and speaking with potential acquisitions about the benefits of being a member of the Thomson Group.
Taxpayer engages in many activities that appear to be services to the subsidiaries or participation in the day-to-day operations of the subsidiaries. Taxpayer’s principal income is the management fee paid to it by the subsidiaries. This fee, which the subsidiaries deduct as an operating expense, amounts to substantially all of its reported net income. Taxpayer has not shown through any quantitative proof that less than 10 percent of its activities are devoted to the provision of services or participation in its subsidiaries’ day-to-day operations, or that the business and asset test when recalculated to take these activities into account would reflect qualified investment activities at 90% or more. I therefore conclude that Taxpayer does not qualify as an investment company under N.J.S.A. 54:10A-5(f) and 54:10A-4(d).
IV
Taxpayer contends that it is entitled to a refund for 1988 on the ground that the management fee reported as income for 1988 was overstated because it included amounts paid to its subsidiaries which Taxpayer characterized as “subsidies.” Taxpayer also contends that similar overpayments for 1986 and 1987 should be used to offset any tax deficiency for those years.
Taxpayer argues that a portion of the income reported as management fee includes its payments of subsidies to its subsidiaries to cover extraneous and unexpected expenses that were not anticipated in the financial plan of the subsidiary and if paid by the subsidiaries would cause them not to achieve their financial goals. The subsidies were regarded as a “loan.” It was testified *421 that the subsidy was intended to be paid back by the subsidiaries but in fact was not. The Thomson Group vice president of tax testified that the subsidies were included in the management fees reported by Taxpayer on its CBT returns. He stated that the management fee calculations were made from the general ledger and the person preparing the management fee figure for the tax returns would not have been aware that the subsidies paid by Taxpayer to the subsidiaries should not be added to the management fee figure. Taxpayer provided evidence of the amount of the subsidies but did not produce evidence supporting its contention that the management fees included as income on the 1986-1988 returns were overstated by the amount of the subsidies.
There is evidence of the amount of the management fee paid to Taxpayer by its subsidiaries in the CBT returns for the three years. There is evidence of the amount of the subsidy payments to the subsidiaries for the three years in a handwritten joint exhibit (J16) entitled “Subsidy Payments.” The subsidies paid by Taxpayer reimbursed the subsidiaries for moving expenses, insurance costs, rent, developmental costs and certain payroll charges. The vice president of tax testified that the subsidiaries deducted the same amount of management fees reported by Taxpayer on its CBT returns but did not, in addition, deduct the expenses for rent, moving, insurance, land development and payroll expenses defrayed by subsidies from Taxpayer on their federal and state income tax returns.
No books, records or other accounting evidence that set forth specifically the components of the management fee and demonstrate that the subsidies are a component of the management fee were offered in evidence. Therefore, other than the statement of the vice president of tax of Taxpayer’s parent that the subsidies were included in the management fee, there is no evidence in the form of work papers or financial statements to establish that the subsidies were included in the management fee or the amount thereof. Neither the CEO nor Taxpayer’s Controller could demonstrate by accounting evidence that the subsidies were included in the management fee. I must therefore conclude that Taxpayer *422 has not borne its burden of establishing that the subsidies were included in the management fees or the amount thereof.
V
I conclude that because Taxpayer has not demonstrated that it qualifies as an investment company under the business tests in N.J.AC. 18:7-1.15(F)(1), Taxpayer does not qualify for favorable tax treatment under N.J.SA 54:10A-5(d).
Taxpayer has not established that the subsidies are included in the management fee and therefore may not offset its tax deficiency for years 1986-1988 with the subsidies paid to its subsidiaries in those years. Judgment will be entered accordingly.

 Taxpayer’s name was International Thomson Business Press, Inc. for the tax years 1986 and 1987.

 Beginning with the accounting period on or after April 1, 1983, the net worth component of the tax base was phased out and no longer applies to accounting periods beginning on or after July 1, 1986. L.1983, c. 75. The net worth portion of tax applies only to Taxpayer’s 1986 calendar year tax return.

 Referred to on CBT returns as investment income.

 Two of Taxpayer's subsidiaries file New Jersey CBT tax returns.

 The numerator is the management fee, the denominator is the management fee plus interest and other adjustments.