[No. 22907-2-II. Division Two. October 23, 1998.]

SIMPSON INVESTMENT COMPANY, *Appellant*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

---

[4]Verbatim report of proceedings at 7.

[5]*See Reynoso*, 41 Wn. App. 113.

906

*George C. Mastrodonato, Kathleen D. Benedict*, and *Michael B. King* of *Lane Powell Spears Lubersky*, for appellant.

*Christine O. Gregoire, Attorney General*, and *John S. Barnes, Assistant*, for respondent.

HUNT, J. — Simpson Investment Company (Simpson) appeals summary judgment for the State of Washington Department of Revenue (Department) on Simpson's action for refund of business and occupational (B&O) tax paid from January 1, 1988, through May 31, 1996. Simpson argues that the Department should have allowed deduction of investment income under RCW 82.04.4281 before calculating its B&O tax liability. The Department contends that Simpson is a "financial business" under RCW 82.04.4281, whose B&O tax liability should be calculated without deduction for investment income. Holding that Simpson is not a "financial business" and is, therefore, entitled to deduct its investment income in calculating its

B&O tax, we reverse and remand for calculation of Simpson's refund.

## FACTS

The facts are largely undisputed. Simpson Investment Company was formed in 1985 as the parent holding company of Simpson Timber Company, Simpson Paper Company, Simpson (formerly "Western Pacific") Extruded Plastics Company, and Simpson Foreign Sales Company. Simpson owns 100 percent of these companies and their subsidiaries.[1] Simpson does not manufacture a product for sale but, instead, performs shared administrative services for the group, including finance and accounting, credit, human resources, legal, management information services, public affairs, risk, tax, and treasury. Simpson does not charge the companies or their subsidiaries for its services. Rather, its subsidiary companies pay dividends to Simpson.

Simpson also receives a small percentage of its income from overnight interest earned through investment of its subsidiaries' excess funds under a cash management system. Simpson implemented the cash management system to "fully utilize all of the liquid resources of the Simpson group of related entities." Simpson has cash management systems in place at Seafirst Bank, Mellon Bank, and Wells Fargo Bank. Each subsidiary maintains one or more deposit and disbursement accounts. Simpson maintains a concentration account[2] through which Simpson moves funds back and forth between these subsidiary accounts on a daily basis. To the extent that there are excess funds in any subsidiary accounts, Simpson transfers these funds internally to cover other subsidiaries' deficits before resorting to outside financing.

Simpson utilizes a daily target of a zero balance in all

---

[1] All but Simpson Foreign Sales Company have at least one subsidiary.

[2] A concentration account is the central account maintained by Simpson, to which excess funds from subsidiaries' accounts are "swept," and from which funds are transferred to subsidiaries' accounts with negative balances.

subsidiary accounts, leaving available as much money as possible either for other subsidiaries or for overnight investment by Simpson. No written evidence of any indebtedness memorializing the funding activity, or purporting to create any debtor-creditor relationship between the parties, is created. Any funds remaining at the end of the business day are invested by Simpson in overnight, short-term deposits; any interest earned is paid to these concentration accounts—maintained by Simpson.[3]

Simpson earns additional investment income from three other sources: (1) dividends from a small stock portfolio, (2) futures trading, and (3) minor amounts of interest earned from notes and contracts. With regard to the stock portfolio, Simpson owns token shares[4] of stock in competitor companies in order to track their productivity and to obtain financial information available to shareholders. Except for larger amounts of Longview Fibre Company and Palmer G. Lewis Company stock formerly held for investment purposes, Simpson has generally kept this stock portfolio merely for informational purposes. Moreover, all of the Palmer G. Lewis Company stock and all but 100 shares of the Longview Fibre Company stock were sold during the period in question.

With regard to futures trading, Simpson began lumber and plywood commodity price hedging in 1977 and continued through April 1990. The purpose of this trading was to reduce price volatility inherent in the sale of lumber and plywood. Simpson accomplished the price hedge by selling contracts for the future delivery of lumber on the Chicago

---

[3]Simpson maintains that it does not keep the interest, but that the interest remains in the various concentration accounts for future use by the subsidiaries. Simpson acknowledges that the individual subsidiaries do not receive interest payments in proportion to the amount of invested funds originating from each subsidiary. It argues, however, that leaving the interest in the concentration accounts, and not using the interest for Simpson's benefit, shows that the subsidiaries actually did receive all the interest and that Simpson kept none. For our purposes, it is irrelevant whether or not Simpson is treated as keeping this accrued interest.

[4]Simpson typically acquires 100 shares of common stock of each publicly traded competitor.

Mercantile Exchange when those prices exceeded Simpson's corporate plan forecast or were higher than regular customers were willing to pay at the time. When the expiration date for a futures contract approached, Simpson closed out the contract and sold an equal volume of lumber to Simpson's regular customers at market price. If commodity price levels had fallen since the date of the original futures contract sale, then Simpson would record a profit in the "futures trading" account. If market prices had risen since the sale of the futures contract, Simpson would record a loss when the contract was closed; but lumber prices paid by Simpson's customers would be higher than expected several months earlier. Simpson accumulated the gains and losses from the futures contracts in one ledger account for financial control purposes.[5]

The Department assessed Simpson's B&O tax under the "service and other activities" classification for the period January 1, 1988, through December 31, 1991.[6] The tax was imposed on Simpson's revenues from interest, dividends (other than those received from its subsidiaries), and other investment income. Simpson paid the assessment and sought relief through the Department's administrative appeal process; the appeal was unsuccessful. Simpson paid an additional $45,307 in B&O tax on its income from interest, dividends, and other investment income for the period January 1, 1992, through May 31, 1996.

Simpson sued for refund of all B&O taxes and interest paid; Simpson sought summary judgment on grounds that its investment income qualified under RCW 82.04.4281 for deduction from the B&O tax. But the trial court granted summary judgment to the Department instead, finding that: (1) no genuine issue of fact exists that Simpson derives all its income from investment sources; (2) Simp-

---

[5]It is unclear what became of any "profits" from the hedging, but the matter is irrelevant for purposes of our holding. Profit was not Simpson's primary goal in hedging; Simpson mainly kept track of these numbers in order to adjust average sales per thousand board feet in quarterly or annual comparisons.

[6]The total tax and interest assessed was $137,420.

son is a "financial business" for purposes of RCW 82.04.4281; and (3) therefore, Simpson may not deduct its investment income from calculation of its B&O tax liability. The court found that Simpson's investment income includes: interest on overnight deposit of its subsidiaries' funds not returned to the subsidiaries; dividends on stock held in competitor timber and forest products industries; income from wood products market hedging in futures trading; and minor amounts of interest earned from notes and contracts.

Simpson appeals the trial court's determination that it is a "financial business" for purposes of RCW 82.04.4281 and that it is therefore unable to deduct its investment income before calculating its B&O tax liability. Simpson also argues that the Department's interpretation of RCW 82.04.4281 is inconsistent with the statute and violates the APA.[7]

## ANALYSIS

■■ We review de novo the trial court's conclusions of law in a tax refund action. *Nordstrom Credit, Inc. v. Department of Revenue*, 120 Wn.2d 935, 940, 845 P.2d 1331 (1993). When statutory language is ambiguous, courts generally defer to the agency's interpretation, if the law being interpreted is within the agency's expertise. *Waste Management, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 627-28, 869 P.2d 1034 (1994). But an "administrative determination will not be accorded deference if the agency's interpretation conflicts with the relevant statute." *Senate Republican Campaign Comm. v. Public Disclosure Comm'n*, 133 Wn.2d 229, 241, 943 P.2d 1358 (1997) (citation omitted).

■■ Generally, courts strictly interpret ambiguities in statutes imposing taxes in favor of the taxpayer. *Sacred Heart Med. Ctr. v. Department of Revenue*, 88 Wn. App. 632, 636-37, 946 P.2d 409 (1997). But if the ambiguity

---

[7]Although the trial court did not address either of these issues in its summary judgment ruling, both parties argued these issues below and on appeal.

concerns an exemption or deduction, the burden is on the taxpayer to establish an exemption, *Deaconess Med. Ctr. v. Department of Revenue*, 58 Wn. App. 783, 788, 795 P.2d 146 (1990), and to show that it is entitled to a refund:

> In connection with [exemptions and deductions], the burden of showing qualification for the tax benefit afforded likewise rests with the taxpayer. And, statutes which provide for either are, in case of doubt or ambiguity, to be construed strictly, though fairly and in keeping with the ordinary meaning of their language, *against the taxpayer*.

*Group Health Coop. v. Washington State Tax Comm'n*, 72 Wn.2d 422, 429, 433 P.2d 201 (1967) (emphasis added). Under such a taxation paradigm, "[t]axation is the rule and exemption is the exception." *Budget Rent-a-Car, Inc. v. Department of Revenue*, 81 Wn.2d 171, 174, 500 P.2d 764 (1972).

▆▆▆ "We should not and do not·construe an unambiguous statute." *Vita Food Prods., Inc. v. State*, 91 Wn.2d 132, 134, 587 P.2d 535 (1978). An ambiguity arises when a term is fairly susceptible to two or more reasonable interpretations. *Schelinski v. Midwest Mut. Ins. Co.*, 71 Wn. App. 783, 787, 863 P.2d 564 (1993). When construing ambiguous statutory language our goal is to carry out the intent of the Legislature. *Seven Gables Corp. v. MGM/UA Entertainment Co.*, 106 Wn.2d 1, 6, 721 P.2d 1 (1986). When determining intent, we interpret the language at issue in the context of the entire statute. *In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 778, 903 P.2d 443 (1995). Words that are not statutorily defined must, whenever possible, be given their ordinary and usual meaning. *Palmer v. Department of Revenue*, 82 Wn. App. 367, 372, 917 P.2d 1120 (1996). We avoid statutory interpretations that are "[s]trained, unlikely, or unrealistic[.]" *Bour v. Johnson*, 122 Wn.2d 829, 835, 864 P.2d 380 (1993).

### I. Is Simpson a "financial business"?

RCW 82.04.220 imposes a B&O tax on every person "for

the act or privilege of engaging in business activities." The Legislature's intent was "to impose the business and occupation tax upon virtually all business activities carried on within the state," *Time Oil Co. v. State*, 79 Wn.2d 143, 146, 483 P.2d 628 (1971), and to "leave practically no business and commerce free of the business and occupation tax." *Budget Rent-a-Car*, 81 Wn.2d at 175.

Before July 1, 1993, RCW 82.04.290 specified that the "other business or service activities" B&O tax rate was to be imposed on the gross income of persons engaging in a business activity other than, or in addition to, those enumerated in other sections of RCW 82.04.290 (i.e., extracting, manufacturing, retailing, wholesaling, etc.). Lending and investment institutions fell within this "other business or service" category.

In 1993, the Legislature amended RCW 82.04.290 and added a new B&O tax reporting classification for "financial business" services. Effective July 1, 1993, RCW 82.04.290(2) imposed the B&O tax on a financial business's income.[8] *See* LAWS OF 1993, 1st Spec. Sess., ch. 25, § 203. The financial business service B&O tax applies to every "person"[9] in Washington engaging in banking, loan, security, investment management, investment advisory, or other financial businesses. RCW 82.04.290(2).

"Financial businesses" B&O taxes are calculated at the lowest possible tax rates for general services businesses. RCW 82.04.290(2). Simpson has been reporting its investment activity income under this "financial business" classification since July 1, 1993.

The Department maintains that interest income from Simpson's overnight deposits of its subsidiaries' monies[10] subjects all of Simpson's investment income to B&O tax

---

[8]The Legislature carried out another major revision of RCW 82.04.290 in 1997, effective July 1, 1998, but those changes do not concern this case.

[9]"Person" is broadly defined by RCW 82.04.030.

[10]At this time the Department is not seeking to include as "investment income" Simpson's dividends from its subsidiaries. As discussed, *infra*, these amounts are specifically exempted under RCW 82.04.4281.

under both the "other business or service activities" and "financial businesses" classifications. The Department also contends that Simpson's election to report B&O taxes under the "financial businesses" classification for the period July 1, 1993, to May 31, 1996, shows that Simpson is a financial business.

But Simpson reported under the "financial businesses" classification because the Department insisted that Simpson was a "financial business" and that Simpson pay the corresponding B&O tax. Moreover, the financial business classification offered a lower tax rate than the general services B&O classification. Simpson paid B&O tax during this period to avoid having to pay penalties and additional interest. Nevertheless, Simpson maintains that it should not be paying any B&O tax at all on its investment income. Thus, Simpson's payment of B&O taxes as a "financial business" during this litigation does not answer the question of whether Simpson actually is a "financial business" for B&O tax purposes.

RCW 82.04.4281[11] provides a limited deduction or exemption from the B&O tax for investment income under certain circumstances:

> In computing tax there may be deducted from the measure of tax amounts derived by persons, *other than those engaging in banking, loan, security, or other financial businesses*, from investments or the use of money as such, and also amounts derived as dividends by a parent from its subsidiary corporations.

(Emphasis added.) Thus, income derived from investments is deductible under RCW 82.04.4281 only if Simpson is not engaged in "banking, loan, security, or other financial busi-

---

[11]Formerly RCW 82.04.430(1). RCW 82.04.430(1) was the predecessor to RCW 82.04.4281. In 1980, the Legislature separated most sales, use, and B&O tax deduction and exemption statutes into shorter, stand-alone sections. RCW 82.04.430(1) thus became RCW 82.04.4281. LAWS OF 1980, ch. 37, § 2. The intent of the Legislature in separating these sections was "to improve the readability and facilitate the future amendment of these sections. This separation shall not change the meaning of any of the exemptions or deductions involved." LAWS OF 1980, ch. 37, § 1.

ness . . . ." Simpson is clearly not engaged in banking, loan, or security businesses. The question is whether Simpson is engaged in a "financial business."

 The Department argues that in order to qualify for the RCW 82.04.4281 deduction, a taxpayer must meet a two-part test: First, the taxpayer's investment income must be derived from "investments or the use of money as such . . . ." Second, the taxpayer cannot be engaged in a "banking, loan, security, or other financial business." The Department contends that Simpson fails to meet both parts of this test. We disagree.

## 1. Investment Income

 The Department contends: that Simpson derives its "investment income"[12] from the use of subsidiaries' funds; and that this income is therefore compensation for cash management activities or for services provided by Simpson, rather than true investment income.[13] But the Department cites no support for this assertion. The subsidiaries pay no management or service fees to Simpson. RCW 82.04.4281 is clear on its face that the investment income deduction is not limited to a particular source, but rather extends to all income from investments, the use of money as such, and dividends from a parent's subsidiary corporation.[14] Accordingly, we hold that Simpson meets the first part of the test because: (1) the subsidiary dividends are not at issue; and (2) the interest earned from its portfolio, futures trading and subsidiary accounts is "investment income" for

---

[12]Investment income at issue includes income from overnight deposits, futures trading, and dividends from nonsubsidiaries, generally amounting to less than five percent of Simpson's annual income.

[13]The Department does not advance a similar argument with respect to Simpson's dividends from its subsidiaries. Simpson deducted those dividends under RCW 82.04.4281; the Department apparently did not contest that characterization, even though subsidiary dividends account for approximately 95 percent of Simpson's income.

[14]RCW82.04.4281 specifically permits a deduction for "amounts derived as dividends by a parent from its subsidiary corporations." Nothing prevents Simpson from avoiding B&O tax by taking its compensation from its subsidiaries in the form of dividends rather than as explicit payments for services provided.

purposes of the statutory deduction. In the words of the Washington Supreme Court, they are "incidental invest-ments of surplus funds[.]" *John H. Sellen Constr. Co. v. Department of Revenue*, 87 Wn.2d 878, 883, 558 P.2d 1342 (1976).

### 2. "Financial Business"

Simpson also meets the second part of the test. Simpson is not a "financial business" within the meaning of RCW 82.04.4281. Because the term "financial business" is not defined by the statute, we look to the ordinary and com-mon meaning. *Garrison v. Washington State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976).

### a. *Sellen*

■ The first case to address when a taxpayer is a "financial business" for purposes of the investment income B&O tax deduction was *Sellen*: "the common meaning of the phrase contemplates a business whose primary purpose and objective is to earn income through the utilization of significant cash outlays." *Sellen*, 87 Wn.2d at 882. (Empha-sis added.) The court ruled that the ejusdem generis rule of statutory construction required that

> the generic term "other financial businesses" must be read in conjunction with the terms "banking, loan, and security." The generic term only extends to businesses that are comparable to one of the specific categories but technically not falling within one of the three categories.

*Sellen*, 87 Wn.2d at 884.

Here, Simpson's "primary purpose and objective" is not "to earn income through the utilization of significant cash outlays," as is true of the banking, loan, and security busi-nesses listed in the statute. Rather, Simpson's primary

purpose and objective is to manage its timber industry related subsidiaries.[15]

■■ ■■ The *Sellen* court rejected the Department's position that every business with investment income is a financial business:

> If we adopt [Department's] interpretation of RCW 82.04.430(1), then few taxpayers, if any, making *incidental investments of surplus funds* could receive the deduction. [Department] equates investing any income with being a financial business and, in effect, this renders the statute a nullity. By interpretation we should not nullify any portion of the statute.

*Sellen*, 87 Wn.2d at 883. (Emphasis added.) The court found that the *Sellen* taxpayers were not financial businesses and were therefore entitled to the RCW 82.04.430(1) investment income deduction.

The *Sellen* court's analysis was heavily influenced by these facts: (1) the taxpayers all carried on active trades or businesses;[16] and (2) all investment income was merely incidental to each taxpayer's primary business. The court found persuasive that the investment income was an extremely small portion of each taxpayer's gross income (under three percent where the amount was specified). *Id.* at 879-80. Because each taxpayer besides the cemetery, was carrying on an active trade or business, the court found

---

[15]The taxpayers in *Sellen* earned only a small proportion of their gross income from cash investments and thus were precisely the type of taxpayer intended to benefit from RCW 82.04.430(1). But the percentage of a taxpayer's gross income that is investment income is only one factor to consider. That essentially 100 percent of Simpson's revenue is derived from dividends or interest does not mean Simpson cannot qualify for the investment income deduction. Simpson's characterizing as "dividends" the monies it receives from its subsidiaries does not transform the essential character of Simpson's business. Simpson does not function as a mutual fund, for example, taking in monies to invest in an array of businesses in hopes of maximizing its return on its investments. Rather, Simpson utilizes its funds and resources to manage its subsidiaries. As explained by Simpson at oral argument, "Simpson Investment Company" is a misnomer, a carry-over from years ago that does not accurately reflect the true nature of its business.

[16]Except that one taxpayer was a trust maintaining a cemetery's grounds with its income.

that the taxpayers' "businesses are not similar to banking, loan, or security businesses." *Sellen*, 87 Wn.2d at 884. Similarly, we reject the Department's position that Simpson's incidental interest earned overnight from its subsidiaries' surplus funds qualifies Simpson as a "financial business."

### b. *Rainier*

The Washington Supreme Court next clarified the meaning of "financial business" in *Rainier Bancorp. v. Department of Revenue*, 96 Wn.2d 669, 638 P.2d 575 (1982). Rainier was a bank holding company registered under the Bank Holding Company Act of 1956. It had three wholly owned subsidiaries: Rainier Bank, Rainier Mortgage Company, and Rainier Credit Company. Rainier's business activities comprised: receipt of dividends and interest from some marketable securities being liquidated; gains on the sale of securities; and interest received from financing its subsidiaries in the form of equity capital, loans, and advances. While noting that it had not attempted to adopt a strict percentage test in *Sellen*, the court in *Rainier* was influenced by the fact that between 41.1 and 58.1 percent of the taxpayer's gross income was investment income. Nonetheless, the court again declined to adopt a strict percentage test. *Rainier*, 96 Wn.2d at 673.

More importantly, the court found that, while Rainier did not technically fall within the definition of a banking, loan, or security business, its activities were "comparable" to those businesses. *Id.* at 674. Coupling the principle that tax deductions must be narrowly construed, with the fact that the taxpayer's activities were similar to that of a banking, loan, or security business, the court found the taxpayer ineligible for the RCW 82.04.430(1) deduction. *Id.* The court expressly limited its ruling to holding companies engaged in "financial business."

Although Simpson is a holding company, it is

not like Rainier in that neither it nor its subsidiaries are primarily engaged in deriving income from a financial business. The clear language of the statute appears to allow Simpson both to avoid B&O tax on the bulk of its income by electing to receive that income as dividends from its subsidiaries;[17] and to take the seemingly inconsistent position that, despite receiving no income other than dividends and investment income, it is nevertheless carrying on an active trade or business that is not a "financial business." Correction of this apparent anomaly is a task for the Legislature, not the courts.

## II. Does ETB 571 comport with the language of RCW 82.04.4281?

Simpson also argues that the Department's current position on availability of the RCW 82.04.4281 deduction, embodied in Excise Tax Bulletin 571.04.146/109 (ETB 571),[18] is "quite different" from the test established eight years earlier in Determination No. 86-309A. Simpson argues that ETB 571 "creates a whole set of qualification[s] and limitations not found in the language of the RCW 82.04.4281 deduction."

### A. History of Department's Definition of "Financial Business"

In an effort to clarify the *Sellen* holding, the Department issued ETB 505.04.109, 2 ETB 309, dated March 4, 1977 (ETB 505). ETB 505 basically reiterated the holding of the *Sellen* court:

> The court did not define "investments" in its opinion. However, it noted that enterprises "specializing in the handling and investment of funds" would not be entitled to

---

[17]Whether the Department has challenged Simpson's dividend characterization of income from its subsidiaries is not part of this appeal.

[18]Issued June 30, 1995. ETB 571 does not appear in the most recent volumes of Washington Tax Decisions.

the statutory deduction but that those "making incidental investment of surplus funds" should receive the deduction.

Under the holding of the court in *Sellen, income from the incidental investment of surplus or excess funds by persons who are not themselves in a security, investment, or financial business is not subject to tax.*

However, no deduction is permitted with respect to

. . .

3. income from activities which are essentially in competition with financial businesses where such activities are a regular part of the taxpayer's normal business practice.

(Emphasis added.)

The Department takes the position that, under Section 3 quoted above, Simpson's activities would have made its investment income subject to excise tax under ETB 505. We disagree. Simpson is not in competition with financial businesses, so its investment income is deductible under RCW 82.04.4281. For instance, its receipt of interest from overnight bank account deposit of surplus funds is an "incidental" activity that is not essentially in competition with financial businesses. Simpson is merely a bank customer, receiving, not performing, normal banking services.

Because ETB 505 basically reiterated *Sellen*, the Department discovered that much confusion remained about what constituted a "financial business" under RCW 82.04.4281. As a result, it issued Determination No. 86-309A, 4 WTD 341 (1987). 86-309A indicated that:

business entities do not assume the characteristics or functions of "financial businesses" comparable to banks, loan companies, or investment companies, merely by virtue of performing internal fiscal functions. . . . Performing such functions for one's self neither constitutes engaging in "financial business," nor makes the performing entity a "financial business" by nature.

4 WTD at 347.

 Simpson argues that under 86-309A its activities are clearly insufficient to make it a "financial business." The Department attempts to distinguish 86-309A. In 86-309A, the taxpayer's cash management system permitted it to "clean-sweep[]" all of its subsidiary accounts on a daily basis to manage the flow of corporate funds. Like Simpson, the taxpayer maintained no written evidence of the loans between subsidiaries. But, unlike Simpson, the taxpayer did not invest its subsidiaries' funds overnight and therefore received no actual payments of interest on such amounts. Because Simpson did invest its subsidiaries' funds overnight and did not return that interest to the individual subsidiaries, it is not in exactly the same position as the taxpayer in 86-309A, and such income might arguably be characterized as "investment income" subject to the B&O tax. But deriving generally less than five percent of its income from investments[19] does not transform the primary nature or purpose of Simpson from forest products management into a "financial institution" anymore than did a parallel situation in *Sellen.* As allowed in ETB 505, Simpson is entitled to the statutory B&O tax deduction for earnings from "incidental investment of surplus funds," especially when not in competition with true financial businesses. Thus, 86-309A is not necessarily distinguishable from Simpson's position.

B. Current Department Definition of "Financial Business"

A great deal of confusion persisted concerning whether a taxpayer was engaged in a "financial business" for purposes of the RCW 82.04.4281 deduction, and whether a taxpayer's investment income was incidental to its nonfinancial activities. Consequently, the Department created a "bright-line" or "safe harbor" test in Determination No. 93-269ER, 14 WTD 153 (1995). Determination No. 93-269ER overruled previous determinations inconsistent with

---

[19]Simpson's percentage of financial income compared to total revenue of all of its subsidiaries was, for example, 3.5% in 1988, 2.6% in 1989, 5.4% in 1990, and 3.0% in 1991.

its rationale. 14 WTD at 164. The Department immediately followed Determination No. 93-269ER with ETB 571, issued June 30, 1995. Both Determination No. 93-269ER and ETB 571 use a two-part inquiry to determine if a taxpayer is a "financial business."

### 1. Five Percent Safe Harbor

■ The first step of the ETB 571 inquiry is as follows:

> The first inquiry requires determining whether the primary purpose and objective of the taxpayer is to earn income through the utilization of significant cash outlays or whether these activities are merely "incidental" to the taxpayer's nonfinancial business activities. This inquiry is made by applying a percentage test. **The Department *conclusively presumes* that the income is not from engaging in a financial business, but is incidental to the nonfinancial business activities, if the financial income is five percent or less of the annual gross receipts.** The percentage of financial income will be computed by including all calendar or fiscal year *financial income from "loans and investments or the use of money as such"* in the numerator, whether taxable, exempt, or deductible, and including all calendar or fiscal year revenues as normally measured by the B&O tax, including all revenues otherwise exempt or deductible, in the denominator.
>
> **If the first inquiry results in five percent or less of financial income** in each of the years, it is unnecessary to proceed to the second inquiry. **The taxpayer will not be considered as engaging in a "financial business".** If the percentage exceeds five percent in any of the years, it is necessary to proceed with the second inquiry, but only for those years in which the percentage exceeds five percent.

(Emphasis added.)

As explained above in Section II.(A) of this opinion, less than five percent of Simpson's annual gross receipts can be fairly characterized as true investment income. The Department argues that all investment income, including subsidiary dividends, should be included in the numerator for

purposes of calculating what percentage of Simpson's income is "financial." But ETB 571 is quite clear that the numerator includes only financial income from "loans and investments or the use of money as such"; it does not include subsidiary "dividends," even if paid in proportion to services rendered by the parent holding company.

The ETB 571 five percent bright line is met here. Thus, under ETB 571 it is presumed that Simpson's cash management accounts' interest and other investment income is merely incidental to Simpson's "nonfinancial business activities."

### 2. Activities Similar to Banking Businesses

■■■ Where the percentage test is not met, ETB 571 prescribes a second inquiry:

> The second inquiry for determining when a taxpayer's activities constitute a "financial business" involves whether the taxpayer's activities are similar to, or comparable to, those of "banking, loan, [or] security businesses", even though the taxpayer might not technically fall within one of those three categories. The factors which will be considered include, but are not limited to, the source of the income, frequency of investments, volume of investments, percentage of income from investments in relation to the total income of the business, and the relationship of the investment income to the other activities of the business.

Not only does Simpson's "investment income" meet the five percent "safe harbor" test, but also, as explained earlier in Section II.(A) of this opinion, Simpson's activities are not "similar to, or comparable to, those of 'banking, loan [or] security businesses[.]'" ETB 571. Accordingly, Simpson is not a 'financial business' under ETB 571.

### C. Consistency With RCW 82.04.4281

The next issue to be addressed is whether ETB 571 is consistent with the language of RCW 82.04.4281 and with cases interpreting the statute. The term "financial busi-

ness," when read within the context of the banking, lending, and security businesses listed, is not ambiguous. Nevertheless, the term has been interpreted differently by the Department and by taxpayers. Thus, the Department has attempted clarification.

■■■ ETB 571 appears consistent with the language of RCW 82.04.4281 and the cases interpreting RCW 82.04.4281. Although the statute offers no percentage indicators, and the *Sellen* and *Rainier* courts specifically declined to adopt a strict percentage test, the presence of a threshold percentage in ETB 571 (five percent) does not render ETB 571 inconsistent with RCW 82.04.4281. Rather, the percentage test in ETB 571 is simply a safe harbor; failure to meet the percentage test has no direct result. It simply means that the second part of the ETB 571 inquiry, similarity to banking business, must be applied. This second inquiry of ETB 571 is a reasonable interpretation of RCW 82.04.4281, construed in conjunction with the *Sellen* and *Rainier* cases. All are consistent in focusing on the primary activity or objective of the taxpayer to determine whether it is essentially a "financial business," regardless of whether a percentage test is used.[20]

## CONCLUSION

Simpson generally derives less than five percent of its income from investment sources. That the bulk of its income is labeled "dividends" does not make Simpson a "financial business" ineligible for the B&O deduction of RCW 82.04.4281. As the Washington Supreme Court has previously noted, the test of an entity's eligibility for the RCW 82.04.4281 deduction is whether the primary purpose and objective of the entity is to earn income through investment. Here, Simpson's primary purpose is to provide services to its subsidiaries; its investment income is incidental to this primary objective. Accordingly, we reverse the trial

[20]In light of our holding, it is not necessary to address whether issuance of ETB 571 violated the APA.

court's grant of summary judgment to the Department and remand for proceedings consistent with this opinion, including calculation of the B&O tax refund and interest the Department owes Simpson.

SEINFELD and ARMSTRONG, JJ., concur.

After modification, further reconsideration denied December 11, 1998.

Review granted at 137 Wn.2d 1032 (1999).