[No. 65113-7-I.   Division One.   September 12, 2011.]

GETTY IMAGES (SEATTLE), INC., *Appellant*, v. THE CITY OF
SEATTLE, DIRECTOR OF THE DEPARTMENT OF EXECUTIVE
ADMINISTRATION, DIVISION OF REVENUE AND
CONSUMER AFFAIRS ET AL., *Respondents*.

*Gregg D. Barton* and *Stephanie J. Boehl* (of *Perkins Coie LLP*), for appellant.

*Peter S. Holmes*, *City Attorney*, and *Kent C. Meyer*, *Assistant*, for respondents.

¶1 SCHINDLER, J. — Getty Images (Seattle) Inc. (Getty Seattle) appeals a tax assessment for business and occupation (B&O) taxes from January 1, 2002 through December 31, 2006 issued by the director of the City of Seattle Department of Executive Administration, Division of Revenue and Consumer Affairs (Director). We affirm.

## FACTS

¶2 The facts are undisputed. Getty Seattle is a Washington corporation located and registered in the city of Seattle (City), and is the headquarters of Getty Images Inc. (Getty Images). Getty Images is the parent company of approximately 60 affiliated companies and has offices in more than 25 different countries. Getty Images licenses and sells stock photographs, footage, and editorial images for a fee.

¶3 As the headquarters for Getty Images, Getty Seattle provides the administrative and managerial services to the Getty affiliates, including human resources, technology support, legal services, accounting, budgeting, payroll, and billing. Approximately 450 employees work at Getty Seattle.

¶4 Getty Seattle was also responsible for the cash management concentration account for Getty Images. As part of

the cash management system, the bank consolidates the funds from the separate accounts of the Getty affiliates each night to obtain a higher interest rate. Funds are then transferred from the concentration account to the separate bank accounts of the Getty affiliates.

¶5 In response to a foreign audit in 2001, Getty Images reorganized and required the Getty affiliates to enter into formal written agreements for administrative and managerial services. Without a formal agreement, Getty Images could not deduct the cost of the administrative services that Getty Seattle provided to the foreign affiliates. In September 2001, Getty Seattle formed a limited liability corporation under the laws of California, Getty Images (Management Company) LLC (Getty Management). Getty Management is a wholly owned subsidiary of Getty Seattle. Getty Management has no employees and no real property. Getty Images also assumed control of the cash management concentration account.[1]

¶6 Effective January 1, 2002, Getty Seattle entered into the "General and Administrative Services Agreement" (GASA) with Getty Management. The GASA states Getty Management "is engaged in the business of providing general and administrative services" to the Getty affiliates. In the GASA, Getty Management appoints Getty Seattle as an "independent contractor" to provide all the "general and administrative services" to the Getty affiliates, including headquarters operations, payroll, billing, legal, technology support, and human resources. As consideration "for the Costs of the Services," Getty Management agrees to pay Getty Seattle $1 million per year. The GASA is signed on behalf of Getty Seattle by Steven Cristallo, the "VP" (vice president) of Getty Seattle; and Steven Cristallo, the VP of Getty Management.

¶7 Getty Management entered into written agreements with the Getty affiliates to provide administrative and

---

[1] Getty Seattle managed the concentration account in 2002. Getty Images assumed responsibility for the account in 2003.

financial services. There is no dispute that the 450 employees at Getty Seattle provide the administrative services, determine what services are necessary, and the amount to charge, and prepare invoices for the services provided to each of the affiliates. The invoices prepared by Getty Seattle include the Getty Seattle address.

¶8 From January 2002 through December 2006, the amount charged to the Getty affiliates for administrative and managerial services is equal to the costs Getty Seattle incurred in providing those services. The costs ranged between $25 million and $98 million per year, for a total of approximately $307 million during the audit period. Getty Seattle and Getty Management file "a single federal income tax return that includes the revenue and expenses of both companies."

¶9 The payments from the Getty affiliates for administrative services were recorded as income to Getty Management. The parties stipulated that the gross income from the Getty affiliates totaled approximately $307 million. But each year, Getty Management paid Getty Seattle only the $1 million agreed to in the GASA. Getty Seattle recorded the $1 million as income and paid B&O tax on that amount each year.

¶10 Getty Seattle was authorized to withdraw funds from the cash management concentration account in order to pay the additional cost of providing administrative services to the Getty affiliates, including payroll for the 450 employees, as well as rent, equipment, and other expenses. The amounts transferred from the cash management account to pay the expenses incurred to provide administrative services were recorded as an account payable owed by Getty Seattle to Getty Management.

¶11 The Director conducted an audit of Getty Seattle for January 1, 2002 through December 31, 2006. The Director concluded that gross income for Getty Seattle as defined by the City's tax code included the amounts Getty Seattle

received in order to provide administrative services to the Getty affiliates. The letter states, in pertinent part:

> The value of the services provided by [Getty Seattle] can be measured by the charges billed out by [Getty M]anagement company, ranging from $25 million to $98 million per year. You have indicated that your entity establishes the value of the management fee based on the services you provide. Your firm is the parent company of [Getty Management], and you file a combined federal tax return which includes both entities together, and which rolls up into the combined federal return of Getty Images, Inc. and subsidiaries. By booking the revenue on [Getty Management], with very little accompanying expenses, the net income of [Getty] Management is very large. By contrast, with all of the management service expense booked on [Getty Seattle], and with very little corresponding revenue, a large net loss is shown on [Getty] Seattle's books for all of the years of the audit period.

The Director also concluded that because the $1 million annual fee agreed to in the GASA "is not an accurate, 'arms-length' transaction between separate entities," and the services provided by Getty Seattle are the basis for the management fee, "the revenue booked on the [Getty M]anagement LLC should be reported by your firm."

¶12 The Director issued an assessment of approximately $1.6 million for additional B&O taxes and interest. Getty Seattle paid the assessment and filed an appeal with the City of Seattle Hearing Examiner.[2] Getty Seattle argued that the Director erred in assessing B&O tax on the amount received to pay for the services provided to the Getty affiliates. Getty Seattle asserted that only the consideration of $1 million per year that was agreed to in the GASA was subject to B&O tax.

¶13 Before the hearing, Getty Seattle and the Director entered into a "Stipulation of Facts." In the stipulation, the parties agreed that during the audit period, the charges for

---

[2] SEATTLE MUNICIPAL CODE 5.55.140(A)(1).

administrative services to the Getty affiliates "ranged between $25 million and $98 million per year," totaling approximately $307 million; that under the GASA, "Getty Seattle incurs expenses providing services to Getty Management"; and that "Getty Seattle used cash in its bank account to pay the expenses it incurred to provide the services under the [GASA]."

¶14 At the hearing, Getty Seattle Chief Financial Officer Jeffrey Dunn testified that Getty Seattle received funds from the cash management concentration account for payroll costs and other expenses incurred by Getty Seattle in order to provide administrative and financial services.

> [Dunn]. I think, again, the primary reason was to – to effect the management charges to the foreign affiliates, with the secondary reason being to avoid an increase in tax in the state of Washington.
>
> Q. Getty of Seattle could not continue to perform its management services under its contract with Getty Management unless it received these payments through the cash management system to pay its expenses, correct?
>
> [Dunn]. That's correct.[3]

¶15 Dunn also testified about the importance of entering into formal agreements with the foreign affiliates for tax purposes and the need to create Getty Management to avoid the City's B&O tax. Dunn testified, in pertinent part:

> So it was critical to -- critical for us to implement this process of -- of charging these management fees and getting the deductions in the foreign countries. In doing so, we would have increased our exposure to B&O tax both in the state of Washington and the city of Seattle, and so the management company structure was -- was used to shield that increase in tax.

¶16 The hearing examiner concluded Getty Seattle did not demonstrate that the assessment for B&O tax was

---

[3] Dunn's predecessor also conceded that the arrangement between Getty Management and Getty Seattle related to local taxes.

incorrect and affirmed the Director. The hearing examiner's decision states, in pertinent part:

> Because Getty Seattle's costs for providing administrative and management services were equal to the approximately $307 million in charges invoiced to affiliated companies for the services, the Director correctly determined that for purposes of the business and occupation tax, the value of the services should be measured by the amount of the charges. From that amount, the Director correctly deducted the $1 million of revenue Getty Seattle reported each year.

The hearing examiner entered written findings and conclusions. The hearing examiner found that Getty Images entered into formal written agreements to charge the foreign affiliates for administrative services "to take advantage of certain deductions in calculating taxes payable to their respective governments," and that Getty Seattle formed Getty Management to avoid paying B&O tax. The hearing examiner also found that the costs of providing the administrative services corresponded to the charges made during the audit period, and that those costs were paid with funds from the concentration account. The findings state, in pertinent part:

> On a monthly basis, Getty Seattle calculates its costs to provide the administrative services to affiliates. Those costs are equal to the charges billed out to the affiliate companies. The charges are billed by Getty Seattle on invoices that state they were sent by Getty Management but include Getty Seattle's address.
>
> . . . The charges for services invoiced by Getty Management ranged between $25 million and $98 million per year during the audit period. Payment for the services invoiced was made to Getty Management.
>
> . . . Each year during the audit period, Getty Management paid Getty Seattle the $1 million annual fee for its services, as provided in the [GASA]. Getty Seattle accrued $1 million of income on its books each year and timely reported and paid Seattle B&O tax on it.
>
> . . . Getty Management accrued the $25 million to $98 million in fees as income on its books, for a total of $306,968,528 during

the audit period. Getty Management's primary expense was the annual $1 million fee paid to Getty Seattle under the [GASA].

. . . .

... Getty Seattle maintains its own bank account from which it pays for rent, payroll, equipment purchases, and other expenses. As Getty Seattle incurred expenses during the audit period, money was automatically moved out of the concentration account and into Getty Seattle's account to cover them. These amounts were reflected on Getty Seattle's books as an intercompany payable owed to Getty Management.

¶17 In addition to the $1 million agreed to in the GASA, the hearing examiner concluded that Getty Seattle received consideration as defined under the City's tax code that was equal to the amounts transferred into Getty Seattle's bank account in order to provide the administrative services to Getty affiliates. The findings state, in pertinent part:

Getty Seattle received consideration for the services it performed for the Getty affiliates in an amount equal to its costs in providing the services. Part of the consideration was paid through the $1 million received each year from Getty Management. The rest consisted of the amounts transferred into Getty Seattle's account to cover its expenses during the audit period. Together, these amounts were "compensation for the rendition of services," and thus, constitute the "gross income of the business" during the audit period. SMC [(Seattle Municipal Code)] 5.30.035 D.

¶18 Getty Seattle filed a statutory writ of review. The superior court affirmed the decision of the hearing examiner. The order states, in pertinent part:

The parties agree to the law and standard that apply. The hearing examiner correctly determined that [G]etty Seattle received consideration for the services it provided to [G]etty affiliates, in the form of amounts transferred into [G]etty Seattle's accounts. The hearing examiner also correctly determined she is not bound by [G]etty Seattle's practice of designating the income as an account payable on its books. These

determinations are justified under the existing code, which defines gross income to include "other emoluments however designated . . . ." SMC 5.30.035D. That the new code makes this more explicit does not invalidate the hearing examiner's decision.[4]

## ANALYSIS

¶19 Getty Seattle contends that the funds transferred from the cash management account to pay the cost of providing administrative and management services to the Getty affiliates is not gross income of the business subject to B&O tax. Getty Seattle asserts the City is only entitled to assess B&O tax on the $1 million agreed to in the GASA, and the hearing examiner erred in recharacterizing the funds Getty Seattle received as consideration for administrative services provided to the Getty affiliates.

*Standard of Review*

¶20 Getty Seattle appealed the hearing examiner's decision by filing a statutory writ under RCW 7.16.120. On appeal of a statutory writ, we review findings of fact for substantial evidence and whether the conclusions of law are erroneous. *Gen. Motors Corp. v. City of Seattle, Fin. Dep't*, 107 Wn. App. 42, 47, 25 P.3d 1022 (2001). Because Getty Seattle does not assign error to the hearing examiner's findings, they are verities on appeal. Accordingly, we determine whether the hearing examiner erred in applying the law to the unchallenged facts. *Gen. Motors*, 107 Wn. App. at 47-48. The burden is on the taxpayer to establish that the B&O tax assessment is incorrect. *Ford Motor Co. v. City of*

---

[4] In 2009, the Seattle City Council amended the code "to ensure taxpayers clearly reflect their true gross income attributable to business activities or transactions between related, controlled or affiliated persons, and to prevent the avoidance of taxes in regards to such activities or transactions." SMC 5.45.085(A); *see* Seattle Ordinance 123063, § 9 (Aug. 17, 2009). The State also added a similar provision related to tax avoidance transactions. LAWS OF 2010, 1st Spec. Sess., ch. 23, § 201.

600

*Seattle, Exec. Servs. Dep't,* 160 Wn.2d 32, 41, 156 P.3d 185 (2007).[5]

■ ¶21 The construction of a city tax ordinance is a question of law reviewed de novo. Municipal ordinances are construed according to the rules of statutory interpretation. *Ford,* 160 Wn.2d at 41. When interpreting statutory language, our goal is to carry out the intent of the legislative body. *Simpson Inv. Co. v. Dep't of Revenue,* 141 Wn.2d 139, 148, 3 P.3d 741 (2000). In determining legislative intent, the meaning of the language used is ascertained in the context of the statute. *Simpson,* 141 Wn.2d at 149. Where a statute is clear on its face, its plain meaning should be derived from the language of the statute alone. *Ford,* 160 Wn.2d at 41. A construction that would render a portion of a statute meaningless or superfluous should be avoided. *Ford,* 160 Wn.2d at 41. When construing a municipal ordinance, we give " 'considerable deference' " to the construction of the ordinance by those officials charged with enforcement. *Ford,* 160 Wn.2d at 42 (quoting *Gen. Motors,* 107 Wn. App. at 57).

*B&O Tax*

■ ■ ¶22 B&O tax is an excise tax imposed for the privilege of doing business in the City. *City of Seattle v. Paschen Contractors, Inc.,* 111 Wn.2d 54, 57, 758 P.2d 975 (1988).

> A B&O tax is an excise tax imposed upon the act or privilege of engaging in business activities, for which the taxing authority provides services, measured by the application of a legislatively set rate against a valuation of the operation of the business, established by some standard such as gross revenues, gross sales, gross income, or the valuation of products.

*Paschen,* 111 Wn.2d at 57.

¶23 The authority to impose B&O tax is based on engaging in business activities that generate the income subject

---

[5] Under SMC 5.55.40(B), the assessment is prima facie correct.

to the tax. *Paschen*, 111 Wn.2d at 57-58. Under SMC 5.45.050(H), the measure of B&O tax is the "gross income of the business." Gross income for purposes of B&O tax is broadly defined.

> Broader language could hardly be devised to convey the idea implicit in the foregoing definitions that the tax applies to everything that is earned, received, paid over to or acquired by the seller from the purchaser or the latter's alter ego.

*Engine Rebuilders, Inc. v. State*, 66 Wn.2d 147, 150, 401 P.2d 628 (1965).

¶24 SMC 5.30.035(D) defines "gross income" as follows:

> [T]he value proceeding or accruing by reason of the transaction of the business activity engaged in and includes gross proceeds of sales, compensation for the rendition of services, gains realized from trading in stocks, bonds or other evidences of indebtedness, interest, discount, rents, royalties, fees, commissions, dividends and other emoluments however designated, all without any deduction on account of the cost . . . paid or accrued and without any deduction on account of losses.

¶25 SMC 5.30.060(F) defines "value proceeding or accruing" as "the consideration, whether money, credits, rights, or other property expressed in terms of money, a person is entitled to receive or accrue or which is actually received or accrued."[6]

¶26 Citing to the dictionary and *Black's Law Dictionary*, the hearing examiner defined "consideration" as follows:

> "[A] recompense, as for a service rendered; fee; compensation," Webster's New World Dictionary . . . , "something given as a recompense," Webster's Third International Dictionary (unabridged), or something "bargained for and received by a promisor from the promisee; that which motivates a person to

---

[6] The City's and State's definitions for "gross income of the business" and "value proceeding or accruing" are nearly identical. *Compare* RCW 82.04.080, *and* RCW 82.04.090, *with* SMC 5.30.035(D), *and* SMC 5.30.060(F).

do something, esp. to engage in a legal act." Black's Law Dictionary.[7]

¶27 "[C]ompensation for the rendition of services" is a portion of the definition of gross income under SMC 5.30.035(D), and the hearing examiner's unchallenged definition of consideration includes "recompense, as for a service rendered; . . . compensation." (Emphasis omitted.) Citing *Black's Law Dictionary*, the hearing examiner also defined "emolument" to mean:

> "[T]hat which is received as a compensation for services, or which is annexed to the possession of office as salary, fees and perquisites; advantage; gain, public or private. Webster." Black's Law Dictionary.[8]

¶28 Getty Seattle contends the hearing examiner erred in concluding that the amount it received to pay the expenses to provide administrative and management services to the Getty affiliates should be treated as consideration and included in the measure of gross income. Getty Seattle asserts that only the $1 million in consideration agreed to in the GASA is subject to B&O tax.[9] Getty Seattle argues that the funds transferred from the cash management account to pay expenses are not consideration but, rather, an account payable.

¶29 Relying on a court of appeals decision that was reversed by the Supreme Court, *Simpson Investment Co. v. Department of Revenue*, 92 Wn. App. 905, 962 P.2d 654 (1998), *rev'd*, 141 Wn.2d 139; as well as a Department of Revenue tax determination, Wash. Dep't of Revenue, Determination No. 86-309A, 4 Wash. Tax Dec. 341 (1987), Getty Seattle argues that the funds received from the cash management concentration account to provide administra-

---

[7] (Emphasis omitted.)

[8] (Emphasis omitted.)

[9] Getty Seattle concedes that the $1 million fee is not a fair market value for the services Getty Seattle provided but argues it is not required to charge Getty Management for the actual cost of the services.

tive services to the Getty affiliates are not subject to B&O tax.

¶30 In *Simpson*, Simpson Investment challenged the Department of Revenue determination that it was a "financial business" subject to B&O tax under the state tax code. *Simpson*, 141 Wn.2d at 142. Simpson Investment was the parent company of four corporations and their subsidiaries. Simpson Investment provided administrative and managerial services but did not charge the subsidiaries for the services. *Simpson*, 141 Wn.2d at 143-44. Instead, Simpson received revenue to pay the costs of providing administrative services primarily from subsidiary dividends that are not subject to B&O tax. Simpson Investment also received investment income from other sources and income from interest on the corporate cash management concentration account it administered on behalf of the subsidiaries. *Simpson*, 141 Wn.2d at 144. Simpson Investment's goal was to realize a return on its ownership interest by increasing the amount of dividends it received from its subsidiaries. "To this end, Simpson provides services, but these services are simply a means of increasing the value of its initial investment, not an independent source of income." *Simpson*, 141 Wn.2d at 153-54.

¶31 The Court of Appeals held that because Simpson was not a financial business, it was entitled to deduct the dividends and other income it received as investment income. *Simpson*, 92 Wn. App. at 909. The Supreme Court reversed. The court held that Simpson Investment is a financial business subject to B&O tax and affirmed the Department of Revenue tax assessment. *Simpson*, 141 Wn.2d at 143.

¶32 Getty Seattle's reliance on a footnote in the Court of Appeals decision is taken out of context and unpersuasive. The footnote states, "Nothing prevents Simpson from avoiding B&O tax by taking its compensation from its subsidiaries in the form of dividends rather than as explicit payments for services provided." *Simpson*, 92 Wn. App. at 917

n.14. Here, unlike in *Simpson*, Getty Seattle on behalf of Getty Management charged the Getty affiliates for the costs of providing administrative and management services. Getty Seattle received an amount equal to the charges for each year ranging from $25 million to $98 million in order to pay the costs incurred to provide those services. The hearing examiner did not err in concluding that the funds transferred from the cash management system to the Getty Seattle bank account to pay the costs of providing administrative services was "compensation for the rendition of services" subject to the B&O tax under SMC 5.30.035(D).

¶33 Revenue Determination No. 86-309A also does not support Getty Seattle's argument that the hearing examiner erred in concluding that the funds Getty Seattle received from the cash management system were subject to B&O tax. Revenue Determination No. 86-309A makes clear that the interest earned on a cash management system is not subject to B&O tax only if it does not "result in any actual payments or receipts to the taxpayer [when] [n]o fee is charged and no consideration or value is actually received." Revenue Determination No. 86-309A, 4 Wash. Tax Dec. at 347. Here, Getty Seattle actually received funds from the cash management account to pay the costs of providing administrative and managerial services to the Getty affiliates.

¶34 Next, Getty Seattle cites *Estep v. King County*, 66 Wn.2d 76, 401 P.2d 332 (1965) to argue that a taxpayer may structure intercompany transactions to avoid tax liability. *Estep* is distinguishable. In *Estep*, the taxpayer avoided paying real estate excise tax by purchasing a corporation that owned real estate, dissolving the corporation, and acquiring the property as a distribution of assets. *Estep*, 66 Wn.2d at 77-78. Because previous case law held that no real estate excise tax was owed when distributing assets of a liquidated corporation, the court rejected the argument that the distribution was subject to real estate excise tax. *Estep*, 66 Wn.2d at 80.

¶35 Getty Seattle also relies on *Weyerhaeuser Co. v. Department of Revenue*, 106 Wn.2d 557, 723 P.2d 1141 (1986) to argue that the hearing examiner erred by ignoring the terms of the GASA and improperly imputing income received by Getty Management to Getty Seattle. In *Weyerhaeuser*, the company sold timber using a lump sum contract that allowed installment payments without charging interest. Nonetheless, to satisfy stock exchange rules, the company computed an interest rate for accounting purposes. *Weyerhaeuser*, 106 Wn.2d at 564-65. "No interest was separately contracted for . . . and no interest was separately 'received'." *Weyerhaeuser*, 106 Wn.2d at 565. The court held that because the company did not actually receive the interest payments, the State could not impute interest as income subject to B&O tax. *Weyerhaeuser*, 106 Wn.2d at 565. Unlike in *Weyerhaeuser*, Getty Seattle received funds from the cash management account to pay the cost of providing administrative services to the Getty affiliates. The hearing examiner did not err in concluding:

> The Hearing Examiner is not bound by Getty Seattle's internal accounting practice of designating the income it received as an account payable on its books, or by the fact that the income was passed through a paper LLC before being paid to Getty Seattle. The *Weyerhaeuser* case supports the Director's assessment.

¶36 Getty Seattle also contends that for the purposes of the B&O tax, the consideration Getty Seattle receives is limited to the $1 million fee agreed to in the GASA. In a recent decision, our Supreme Court rejected a similar attempt to rely on the terms of a contract to avoid B&O tax. *Ford*, 160 Wn.2d at 43-44. In *Ford*, the contract stated that the sales of cars and parts from out-of-state manufacturers to dealers in Seattle and Tacoma were not subject to B&O tax. *Ford*, 160 Wn.2d at 43. The Supreme Court affirmed the assessment of B&O tax by the city of Seattle and the city of Tacoma. The court held that the business of wholesale sales within the city falls within the broad classification of engaging in business for the purposes of the B&O tax

codes, and "the terms of a contract does not determine whether a city can impose" B&O tax. *Ford*, 160 Wn.2d at 42-43.

¶37 Accordingly, regardless of the agreement in the GASA to pay Getty Seattle only $1 million for the administrative services provided to the affiliates, the funds Getty Seattle received to pay for those services is gross income under SMC 5.30.035(D). The cost to provide administrative and management services to the Getty affiliates ranged from $25 million to $98 million per year during the audit period. The payroll costs for the 450 employees as well as the other expenses were paid with the funds transferred from the cash management concentration account to Getty Seattle's bank account. The hearing examiner did not err in concluding that because the costs Getty Seattle incurred to provide the administrative and management services equaled the amounts charged to the Getty affiliates, "these amounts were 'compensation for the rendition of services,' and thus, constitute the 'gross income of the business' during the audit period. SMC 5.30.035 D."

¶38 In addition, Getty Seattle claims the hearing examiner erred in disregarding the separate corporate form of Getty Management and upholding the assessment of the B&O tax on Getty Seattle for income accrued by Getty Management.[10] But the tax assessment is based on the funds actually received by Getty Seattle to pay for the costs for providing the administrative and managerial services to the Getty affiliates. As previously noted, the record establishes that the cost of providing services is equal to the amount billed by Getty Management. The broad definition of gross income and "emoluments however designated"

---

[10] Getty Seattle cites *United States Tobacco Sales & Marketing Co. v. Department of Revenue*, 96 Wn. App. 932, 943, 982 P.2d 652 (1999).

includes the receipt of the funds by Getty Seattle to pay for the services provided.[11]

¶39 In the alternative, Getty Seattle asserts that it received only $82 million directly from Getty Management during the audit period and not $307 million. But at the hearing, Getty Seattle conceded that it received more than $82 million to pay the expenses incurred to provide administrative services during the audit period.

¶40 We affirm.

DWYER, C.J., and SPEARMAN, J., concur.

---

[11] The record also does not support Getty Seattle's argument that the funds were a loan. Dunn conceded there are no documents, such as a promissory note, that obligate Getty Seattle to repay the money it received to pay expenses.