3 P.3d 741 (2000)
141 Wash.2d 139
SIMPSON INVESTMENT COMPANY, Respondent,
v.
STATE of Washington, DEPARTMENT OF REVENUE, Petitioner.
No. 67630-5.
Supreme Court of Washington, En Banc.
Argued October 14, 1999.
July 13, 2000.
*742 Christine Gregoire, Atty. Gen., John S. Barnes, Asst. Atty. Gen., Olympia, for Petitioner.
Lane, Powell, Spears & Lubersky, George Carl Mastrodonato, Kathleen Dell Benedict, Olympia, Michael Barr King, Seattle, for Respondent.
Davis, Wright, Tremaine, Garry George Fujita, Seattle, for Amicus Curiae on Behalf of Association of Washington Businesses.
MADSEN, J.
This dispute between Simpson Investment Company (Simpson) and the State Department of Revenue (Department) presents the question of whether Simpson, a holding corporation for multiple subsidiaries, is a "financial business" for purposes of RCW 82.04.4281 (section 4281). Section 4281 provides a Business and Occupational (B & O) tax deduction for the investment income of all persons not "engaging in banking, loan, security, or other financial businesses." RCW 82.04.4281. The Department assessed B & O taxes against Simpson, claiming it was not entitled to deduct its investment income because it is a "financial business." Simpson contested this assessment in a refund *743 action, culminating in motions for summary judgment. The Thurston County Superior Court denied Simpson's motion, granting summary judgment to the Department, and Simpson appealed. The Court of Appeals reversed, determining that Simpson is not a "financial business" and is therefore entitled to deduct its investment income in calculating its B & O tax liability. Simpson Inv. Co. v. Department of Revenue, 92 Wash. App. 905, 965 P.2d 654 (1998). We find that Simpson is a financial business and reverse the Court of Appeals.

FACTS
Simpson[1] was formed in 1985 as the parent holding company of four corporations: Simpson Timber Company and its subsidiaries; Simpson Paper Company and its subsidiaries; Simpson (formerly Western Pacific) Extruded Plastics[2] and its subsidiary; and Simpson Foreign Sales Company. At all relevant times, Simpson was a one-hundred-percent stockholder in each of these corporations. Collectively, Simpson's subsidiaries are engaged in timber production, forest products manufacturing, and plastic pipe manufacturing.
Simpson itself does not manufacture any tangible product. Instead, through its 172 employees,[3] it provides a variety of shared services for its group of subsidiaries. These administrative and managerial services include: accounting/finance; credit; human resources; legal; management information services; public affairs; risk; tax; treasury; cash management; property management/real estate; land and timber; and corporate administration. Simpson does not charge its subsidiaries for the array of services it provides. Rather, it receives the majority of its revenue in the form of subsidiary dividends, which are not subject to B & O taxation. See RCW 82.04.4281 ("In computing tax there may be deducted from the measure of tax amounts ... derived as dividends by a parent from its subsidiary corporations.")
In addition to subsidiary dividends, Simpson derives investment income from three primary sources: interest on bank deposits, stock dividends, and profits from market hedging and futures trading.[4] These sources of revenue made up only a small percentage of Simpson's gross income for the years at issue in this case, averaging approximately 4.26 percent. It is this "investment income," found subject to B & O tax by the Department, which lies at the heart of this dispute.
The first item of investment income is Simpson's interest income from overnight cash deposits of its subsidiaries' excess funds. This is a by-product of Simpson's "cash management" system, which was designed for the stated purpose of "fully utiliz[ing] all of the liquid resources of the Simpson group of related entities." Clerk's Papers (CP) at 94. Simpson has cash management systems in place at Seafirst Bank, Mellon Bank, and Wells Fargo Bank. Each Simpson subsidiary maintains at least one deposit, as well as one disbursement account, while Simpson maintains concentration accounts. Funds are transferred from subsidiary to subsidiary, based on their respective fiscal needs, through Simpson's concentration accounts. This enables Simpson's subsidiaries to avoid outside borrowing until the excess cash of each subsidiary is depleted. No written evidences of indebtedness memorialize these transfers.
Each subsidiary account maintains a daily target balance of zero. At the end of each day all excess funds are "swept" into Simpson's concentration accounts and invested in interest bearing overnight deposit accounts. The interest earned is then included *744 in the beginning daily balance of each concentration account. It is unclear what ultimately happens with this interest income, but it is clear that there is no pro rata redistribution of funds.
The second item of investment income is Simpson's stock dividends. Simpson owns approximately one hundred shares of stock in each of its publicly traded competitors. This stock is purchased as a means of tracking its competitors' businesses and obtaining financial information that is available to shareholders. After financial information is collected it is placed in an industry database, maintained by Simpson, in order to assess Simpson's performance against competitors and help in the setting of financial rating objectives.
If a stock splits or pays out dividends, Simpson may be left with more than one hundred shares of a given stock. When the number of shares has increased to a point where it is practical, Simpson has, from "time-to-time," sold excess shares to bring the balance down to one hundred. CP at 98. According to Simpson, this stock portfolio was acquired "strictly with the objective of gaining competitive financial and other public information about these competitor companies." Id.
Two notable exceptions exist to Simpson's general practice. From sometime prior to 1988 until 1993, Simpson owned 226,500[5] shares of Longview Fibre stock, worth approximately $1,228,460. This investment returned an average annual dividend of $117,780. In 1993, Simpson sold all but 100 shares of this stock. Simpson also owned 86,507 shares of Palmer G. Lewis stock, worth $879,850.40. All of this stock was sold in 1988. Simpson concedes that these positions were "purchased ... for investment purposes." CP at 98.
Simpson also receives investment income from market hedging and futures trading. Lumber and plywood commodity price hedging was in operation at Simpson until April of 1990 for the stated purpose of "reduc[ing] the price volatility inherent in the sale of lumber and plywood commodity items." CP at 111. The price hedge was accomplished by selling contracts for the future delivery of lumber on the Chicago Mercantile Exchange when those prices exceeded the Corporate Plan Forecast or were higher than regular customers were willing to pay at the time. When the expiration for the futures contract approached, the contract was closed-out and an equal volume of lumber was sold to Simpson's normal customers at the market price. If commodity prices had fallen since the date of the original futures contract sale, there would be a profit from the futures contract.
If market prices had risen since the sale of the futures contract, a loss would be recorded in the Futures Trading account when the contract was closed, but the lumber prices received from Simpson's customers would be higher than expected several months earlier. The gains and losses from the futures contracts were accumulated in one ledger account for financial control purposes. The amount was used to adjust average sales per thousand feet in quarterly or annual comparisons.
Based on the above sources of investment income, the Department assessed Simpson B & O taxes and interest in the amount of $137,420 for the period of January 1, 1988, through December 31, 1991. These amounts were assessed under the "service and other activities" tax classification and were a tax on interest, dividends, and other investment income. CP at 35. This assessment was based on a Department finding that Simpson is a "financial business" for purposes of section 4281 and therefore not entitled to deduct its investment income in computing its B & O tax liability. Simpson, under protest, paid this assessment in full on March 1, 1995.
For the period between January 1, 1992, and May 31, 1996, Simpson paid an additional $45,307 in B & O taxes under the "service and other activities" or "financial business services" classifications.[6] CP at 35-36.
*745 These taxes, for the years 1992 on, were paid by Simpson, beginning on July 12, 1995, in order to avoid the possible imposition of penalties or interest, see RCW 82.32.090 and RCW 82.32.050, and permitting Simpson to file a refund action in superior court. RCW 82.32.180. Even though Simpson paid the assessed taxes for this period, it continued to protest the Department's assessment.
Simpson contested the Department's assessment and sought relief through a series of administrative appeals beginning in 1993. In each appeal, Simpson's claimed entitlement to a section 4281 deduction was rejected. On March 19, 1996, the date of Simpson's final appeal, the Interpretations and Appeals Division of the Department of Revenue issued Determination 96-046, making a specific finding that Simpson is a "financial business" and therefore not entitled to deduct its investment income under section 4281. CP at 64.
Simpson then turned to the courts, bringing a refund action in Thurston County Superior Court on July 1, 1996. Simpson sought summary judgment in a motion filed on August 1, 1996, claiming it was not a "financial business." CP at 8, 17-23. On May 6, 1997, the Thurston County Superior Court denied Simpson's motion and granted summary judgment to the Department, finding that Simpson is a "financial business."
The Court of Appeals reversed, holding that Simpson is not a "financial business" for purposes of RCW 82.04.4281 and is therefore entitled to deduct its interest, dividends, and other investment income in calculating its B & O tax liability. Simpson Inv. Co., 92 Wash.App. at 926, 965 P.2d 654.

ANALYSIS
We are asked to review the Court of Appeals reversal of a trial court grant of summary judgment in favor of the Department. The only issues to be resolved are legal in nature. Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc., 125 Wash.2d 305, 311, 884 P.2d 920 (1994) (citing Rivett v. City of Tacoma, 123 Wash.2d 573, 578, 870 P.2d 299 (1994)). We review a trial court's legal conclusions in a tax refund action de novo. Nordstrom Credit, Inc. v. Department of Revenue, 120 Wash.2d 935, 940, 845 P.2d 1331 (1993).
The principal issue in this case is whether Simpson, a holding company for multiple subsidiaries, is a "financial business" for purposes of RCW 82.04.4281, which provides a B & O tax deduction for the investment income of all persons not "engaging in banking, loan, security, or other financial businesses." Section 4281 provides:
In computing tax there may be deducted from the measure of tax amounts derived by persons, other than those engaging in banking, loan, security, or other financial businesses, from investments or the use of money as such, and also amounts derived as dividends by a parent from its subsidiary corporations.
RCW 82.04.4281 (emphasis added). The term "financial business" is not defined.
When interpreting statutory language, our goal is to carry out the intent of *746 the Legislature. Seven Gables Corp. v. MGM/UA Entertainment Co., 106 Wash.2d 1, 6, 721 P.2d 1 (1986). In ascertaining this intent, the language at issue must be evaluated in the context of the entire statute. In re Sehome Park Care Ctr., Inc., 127 Wash.2d 774, 778, 903 P.2d 443 (1995). We avoid interpretations that are "[s]trained, unlikely, or unrealistic[.]" Bour v. Johnson, 122 Wash.2d 829, 835, 864 P.2d 380 (1993).
In adopting our State's B & O tax system "the legislature intended to impose the business and occupation tax upon virtually all business activities carried on within the state," Time Oil Co. v. State, 79 Wash.2d 143, 146, 483 P.2d 628 (1971), and to "leave practically no business and commerce free of ... tax." Budget Rent-A-Car of Washington-Oregon, Inc. v. Department of Revenue, 81 Wash.2d 171, 175, 500 P.2d 764 (1972). This point is evidenced by the sweeping language of RCW 82.04.220, which provides
[t]here is levied and shall be collected from every person[[7]] a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be.
RCW 82.04.140 provides even greater breadth to the above provision by broadly defining business as
all activities engaged in with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly.
By enacting section 4281, the provision at issue in this case, the Legislature has carved out a narrow exception to the B & O tax. See Budget Rent-A-Car, 81 Wash.2d at 175, 500 P.2d 764 ("the tax is very broad and the exemptions correspondingly narrow.") Normally, tax statutes "must be construed most strongly against the taxing authority." Group Health Coop. of Puget Sound, Inc. v. Department of Revenue, 106 Wash.2d 391, 401, 722 P.2d 787 (1986). However, when interpreting exemption or deduction provisions, "the burden of showing qualification for the tax benefit ... rests with the taxpayer... [and] in the case of doubt or ambiguity, [the provisions are] to be construed strictly, though fairly and in keeping with the ordinary meaning of their language, against the taxpayer." Group Health Coop, of Puget Sound, Inc. v. Washington State Tax Comm'n, 72 Wash.2d 422, 429, 433 P.2d 201 (1967).
In two casesJohn H. Sellen Constr. Co. v. Department of Revenue, 87 Wash.2d 878, 558 P.2d 1342 (1976), and Rainier Bancorporation v. Department of Revenue, 96 Wash.2d 669, 638 P.2d 575 (1982)we have defined the outer parameters of section 4281.[8]
In Sellen, five taxpayers claimed entitlement to an investment income deduction: (1) Sellen Construction Company, a general contractor; (2) Olympia Brewing Company, a beer manufacturer; (3) King County Medical Blue Shield, a nonprofit prepaid medical services provider; (4) Blue-Cross Washington-Alaska, a health care services contractor; and (5) Acacia Memorial Park Permanent Care Fund (AMPPCF), a trust fund established for the "charitable purpose" of providing upkeep to cemetery grounds. Sellen, 87 Wash.2d at 879-81, 558 P.2d 1342. The court found that none of these taxpayers were "financial businesses." Sellen, 87 Wash.2d at 882, 558 P.2d 1342.
First, the court noted that the term "financial business" is not statutorily defined and that in such cases "[w]ords in a statute are *747 given their ordinary and common meaning." Id. (citations omitted). Then, without citation to authority, it determined that the ordinary and common meaning of financial business "contemplates a business whose primary purpose and objective is to earn income through the utilization of significant cash outlays." Id. Next, the court looked to the dictionary definition of "financial institution," which is
an enterprise specializing in the handling and investment of funds (as a bank, trust company, insurance company, savings and loan association, or investment company.
Sellen, 87 Wash.2d at 883, 558 P.2d 1342 (quoting Webster's Third New International Dictionary (1968)). Finally, the court applied a rule of statutory interpretation, ejusdem generis, which provides that general terms, when used in conjunction with specific terms in a statute, should be deemed only to incorporate those things similar in nature or "comparable to" the specific terms. Sellen, 87 Wash.2d at 883-84, 558 P.2d 1342. Thus, this court held
the generic term "other financial businesses" must be read in conjunction with the terms "banking, loan, and security." The generic terms only extends to businesses that are comparable to one of the specific categories but technically not falling within one of the three categories.
Id. at 884, 558 P.2d 1342.
Based on the foregoing analysis, this court held that the taxpayers in Sellen were not "financial businesses." Id. at 882, 558 P.2d 1342. Two facts were critical to the decision in Sellen: (1) each taxpayer was openly engaged in an active trade or business, apart from their investment activities; and (2) the taxpayers "investment incomes represent[ed] a very small percentage of their gross revenues."[9]Id. at 882-83, 558 P.2d 1342.
Six years later, in Rainier, this court addressed section 4281 again. Rainier Bancorporation (Rainier) was a bank holding company registered with the Federal Reserve System. Rainier, 96 Wash.2d at 671, 638 P.2d 575. Rainier owned three subsidiaries, all engaged in banking related industriesRainier Bank, Rainier Mortgage Company, and Rainier Credit Companyand was claiming entitlement to a section 4281 deduction. Id. Reaffirming Sellen's "common and ordinary" definition of financial business, this court held that Rainier was a "financial business" and therefore not entitled to deduct its investment income. Id. at 674, 638 P.2d 575.
Central to the decision in Rainier was the fact that Rainier loaned money to its subsidiaries and charged interest for these loans. Rainier, 96 Wash.2d at 673 n. 2, 638 P.2d 575. Less than one-half of the loaned funds came from Rainier's own accounts. Id. Instead, the majority of funds came originally from outside sources. Id. Interest income, from loans to subsidiaries, made up 41.1 percent of Rainier's gross income for one audit period and 58.1 percent for another. Id. at 673 n. 2, 638 P.2d 575. While this fact was obviously relevant, the court specifically rejected the use of any percentage test in determining if a business is a financial business.[10]Id. Rainier, using the doctrine of ejusdem generis, then held that these loans, among other things, made Rainier "comparable to" a banking, loan, or security business. Rainier, 96 Wash.2d at 674, 638 P.2d 575.
*748 Rainier's holding left open the question presented by the case at bar. As stated in Rainier:
Our decision today is limited to holding companies, such as Rainier, which are engaged in a "financial business". We venture no opinion on the question of whether a holding company that makes its loans solely out of its own surplus funds is subject to the B & O tax.
Id.
Using Sellen and Rainier as a guide, the resolution of two questions is necessary in ascertaining whether Simpson is a financial business: (1) Is Simpson's primary purpose and objective to earn income through the utilization of significant cash outlays; and (2) Applying the interpretive tool of ejusdem generis, is Simpson comparable to a "banking, loan or security" business. We answer both questions in the affirmative.
Both parties accept Sellen's definition of "financial business,"a business whose primary purpose and objective is to earn income through the utilization of significant cash outlayshowever, they disagree as to both its meaning and application to Simpson.[11] Simpson argues that its primary purpose and objective is not to earn income through the utilization of significant cash outlays, but rather it is to provide managerial and support services to its timber industry subsidiaries. The Department argues that Simpson's ownership investment in its subsidiaries is itself a significant cash outlay and that Simpson's primary purpose and objective is to receive a return on that investment.
Simpson is at least in part correct; it does provide support services to its subsidiaries. However, we believe that the relevant question in this case is not what Simpson does, but why it does it. Traditional holding companies, like Simpson, are a unique type of corporation. The United States Supreme Court has noted that the
dominant characteristic of a holding company is the ownership of securities by which it is possible to control or substantially to influence the policies and management of one or more operating companies in a particular field of enterprise.
North Am. Co. v. Securities & Exch. Comm'n, 327 U.S. 686, 701, 66 S.Ct. 785, 90 L.Ed. 945 (1946). Simpson correctly asserts that some of the "services" it provides are nonfinancial in nature (e.g., human resources). If these same services were provided in-house by a corporation that was manufacturing a product or selling a retail service, the rendering of these services would not in and of itself make it a "financial business."
Here we are faced with a much different situation. Simpson, as a separate entity, owns stock in its subsidiaries. It is not a manufacturer, nor does it charge a fee for its services. Simpson's primary goal is simply to realize a return on its ownership interest, i.e., to increase the amount of dividends it receives from its subsidiaries. To this end, Simpson provides services, but these services are simply a means of increasing the value of its initial investment, not an independent source of income. It is well settled that a parent and subsidiary are for legal purposes generally treated as separate entities. Washington Sav-Mor Oil Co. v. State Tax Comm'n, 58 Wash.2d 518, 364 P.2d 440 (1961). This is a legal fiction in many respects, but it should be noted that it is a fiction that bestows great benefits to both the parent and subsidiary. Sav-Mor Oil Co., 58 Wash.2d at 520-23, 364 P.2d 440. *749 Simpson may not reap the benefits of separate corporate existence (e.g., dispersed corporate liability), and then discard its very own corporate identity when it is advantageous to do so.
Simpson, viewed apart from its subsidiaries, is just a very active investor, who in an effort to increase the value of its investment, or significant cash outlay, provides services free of charge to its subsidiaries. This point is coupled with the fact that Simpson itself makes cash outlays to acquire stock in its competitors, receive interest on its overnight deposits of subsidiary funds, and to engage in market hedging and futures trading. Collectively, these characteristics point to the conclusion that Simpson's primary purpose and objective is to earn income through the utilization of significant cash outlays.
The Association of Washington Business (AWB) argues that the "significant cash outlay" test will create absurd and inconsistent results. Br. of Assoc. of Washington Bus. as Amicus Curiae at 5 (quoting State of Washington Dept. of Revenue Supplemental Br. at 11). According to the AWB, only actual "cash" outlays would trigger a Department finding that a corporation is a financial business, thereby excluding from section 4281's scope all holding companies that contribute to their subsidiaries through debt financing or actual contribution of tangible assets. In essence, argues the AWB, Simpson could have used its own cash to buy tangible assets, given those assets to its subsidiaries in exchange for stock, and then not have been deemed a financial business. We believe that this is far too narrow a reading of the phrase "significant cash outlays."
The Department argues that significant cash outlays should be interpreted to mean the direct commitment of capital. We believe that this definition is far too broad. Every profitable business commits capital to its enterprise. The distinction between a "financial business" and any other business should turn on where that capital is committed and what the contributing business receives in exchange for its contribution. In Simpson's case, capital is committed externally to its subsidiaries. Had Simpson contributed tangible assets in exchange for stock, this contribution would also appropriately be deemed a significant cash outlay if these investment activities were Simpson's primary purpose and objective.
Simpson contends that if it is found to be a "financial business" then every holding company in the State will be deemed a financial business. This statement is incorrect. The Department does not argue that all holding companies are "financial businesses." It concedes that in cases where a holding company is actively carrying on a trade or business i.e., providing a fee based service or selling a product), this determination would be wrong. Only companies like Simpson, which appear to have no purpose other than fostering their investments, will be deemed a financial business.[12] This is because its primary purpose and objective is to earn income through the utilization of significant cash outlays.
Using the ejusdem generis rule of statutory construction, we also believe that Simpson is comparable to a banking, loan, or security business. This rule, also applied to section 4281 in both Sellen and Rainier is:
[G]eneral terms appearing in a statute in connection with precise, specific terms, shall be accorded meaning and effect only to the extent that the general terms suggest items or things similar to those designated by the precise or specific terms. In other words, the precise terms modify, influence or restrict the interpretation or application of the general terms where both are used in sequence or collocation in legislative enactments.
State v. Thompson, 38 Wash.2d 774, 777, 232 P.2d 87 (1951). Thus, in the context of section 4281, "the generic term `other financial businesses' must be read in conjunction with the terms `banking, loan, and security.'" Sellen, 87 Wash.2d at 884, 558 P.2d 1342.
*750 Only those businesses that are "comparable to" banking, loan, and security businesses, but technically not falling within one of the three categories will be deemed a financial business. Id.
The Department contends that the Court of Appeals misapplied the ejusdem generis rule of statutory construction by requiring that a financial business be the functional equivalent of a banking, loan, or security business, not just "comparable to" these businesses. Whether that criticism is accurate or not it is quite clear that the court failed to take into account any of Simpson's subsidiary dividends when comparing Simpson's business dealings with those of banking, loan, or security businesses.
The Department argues that "comparable to" should mean other businesses which receive income from the same sources as banking, loan, and security businesses. Sellen supports this approach. Sellen, 87 Wash.2d at 884, 558 P.2d 1342. In applying ejusdem generis the first task is ascertaining what banks, loan companies, and security businesses have in common as a class. These businesses share one principal characteristic; they make money through cash outlays, which generate revenue in the form of interest income, dividends, and appreciation of intangible assets. This is simply an elaboration of Sellen's definition of financial business and it is a description of Simpson's business activities.[13] Simpson makes money through its ownership of subsidiary and competitor stock, earns interest income from the overnight investment of subsidiary funds, and engages in price hedging and futures trading.
The parties' dispute over the characterization of Simpson's business activities is linked to a recurring issue of contention in this case: to what extent should income received by a parent from a subsidiary be deemed investment related. Since almost all of Simpson's activities, as well as 95 percent of its income, are the result of its subsidiary interactions, this issue is of great importance. Both Sellen and Rainier rejected the use of a strict percentage test, comparing the ratio of investment income to other income, as a means of determining whether a company is a financial business. Rainier, 96 Wash.2d at 673 n. 2, 638 P.2d 575. Yet, both cases recognized the obvious point that this fact is relevant in ascertaining the essential characteristics of a business.
Simpson argues that the specific statutory exemption of subsidiary dividends from B & O taxation evidences a legislative intent to exclude this income from any calculation of whether Simpson is a financial business. In essence, Simpson argues that subsidiary dividends are not investment income presumably because they are exempt from B & O taxation. If that is correct, then Simpson receives only a small percentage of its income from investment sources, a factor considered significant by the Sellen court. Thus, Simpson contends that because so small a percentage of its income is derived for investments, Sellen controls this case.
We find Simpson's argument unpersuasive on two grounds. First, unlike Simpson, the taxpayers in Sellen were entities with separate and defined corporate purposes, far and apart from their investment activities. Sellen, 87 Wash.2d at 879-80, 558 P.2d 1342. Second, and most importantly, an analysis of the statutory exemption for subsidiary dividends leads to the conclusion that the Legislature intended these dividends to be treated as investment income.
Consideration of legislative history is a legitimate method of ascertaining legislative intent. Bellevue Fire Fighters Local 1604 v. City of Bellevue, 100 Wash.2d 748, 753, 675 P.2d 592 (1984). In 1970, the Legislature amended section 4281 to exempt from B & O taxation "amounts derived as dividends *751 by a parent from its subsidiary corporations[.]" Laws of 1970, 1st Ex.Sess., ch. 101, § 2(1). This clause was added on to the original language of section 4281. There was an important policy reason for this exemption, for without it subsidiary income would be subject to double taxation. What is most significant is the fact that the Legislature did not exempt holding companies'"investment income" per se. It merely carved out an exemption for amounts derived as dividends by a parent from its subsidiaries from the general rule of taxation. Had the Legislature intended to treat holding companies as nonfinancial businesses they could have worded the exemption in broader terms.
Moreover, the very fact that the Legislature created a deduction is evidence of their apparent belief that at least some holding companies should be deemed "financial businesses." "[T]he legislature does not engage in unnecessary or meaningless acts, and we presume some significant purpose or objective in every legislative enactment." Sellen, 87 Wash.2d at 883, 558 P.2d 1342 (citations omitted). If traditional holding companies, like Simpson, were not financial businesses their investment income (i.e., their subsidiary dividends, among other things) would already have been exempt from B & O taxation under the original language of section 4281. Mindful of the fact that deduction provisions are "to be construed strictly, though fairly and in keeping with the ordinary meaning of their language, against the taxpayer[,]" we find that the Legislature intended that subsidiary dividends be taken into account in determining if a business is a "financial business." Group Health Coop. of Puget Sound v. State Tax Comm'n, 72 Wash.2d at 429, 433 P.2d 201.
Simpson makes one additional argument based on legislative history. In 1993, the Legislature enacted a special tax classification for financial businesses, which provided a lower tax rate
[u]pon every person engaging within this state in banking, loan, security, investment management, investment advisory, or other financial businesses
....
Laws of 1993, 1st Sp. Sess., ch. 25, § 203(2).
In this same legislative session, in a separate statutory provision relating to categories of business that do not fall within the definition of "selected business services," the terms "financial institution" and "financial services" were defined. Financial institution was defined as
a corporation, partnership, or other business organization chartered under Title 30, 31, 32, or 33 RCW, or under the National Bank Act ... the Homeowners Loan Act... or the Federal Credit Union Act ... or a holding company of any such business organization that is subject to the Bank Holding Company Act ... or the Homeowners Loan Act ... or a subsidiary or affiliate wholly owned or controlled by one or more financial institutions
....
Laws of 1993, 1st Sp. Sess., ch. 25, § 201(k)(2)(f).
These provisions were subsequently repealed, but Simpson contends that these revisions evidenced a legislative intent not to tax holding companies as financial businesses. We believe the opposite inference is more reasonable. First, the Legislature used a broader category of businesses when creating a tax rate for "other financial businesses" than it had used in section 4281, adding "investment management" and "investment advisory" to the language of the statute. It is well settled that when the same words are used in different parts of a statute, in this case the term "financial businesses," the meaning is presumed to be the same throughout. De Grief v. City of Seattle, 50 Wash.2d 1, 297 P.2d 940 (1956). This indicates that the Legislature viewed the term "other financial businesses" as broader than Simpson would like this Court to accept.
Simpson further argues that the Legislature's specific reference to a class of holding companies in its definition of "financial institution" evidences an intention to exclude Simpson from this definition, as well as from the definition of "financial business." Simpson makes this argument by repeatedly *752 attempting to equate the terms "financial business" and "financial institution." Undoubtedly, this is due to the fact that Sellen referred to the definition of "financial institution" when seeking guidance in defining "financial business." But these terms are not synonyms, at least in the context of Washington's B & O tax code. Just as it is true that the same words used in the same statute should be interpreted alike, it is also well established that when "different words are used in the same statute, it is presumed that a different meaning was intended to attach to each word." State ex rel. Public Disclosure Comm'n v. Rains, 87 Wash.2d 626, 634, 555 P.2d 1368, 94 A.L.R.3d 933 (1976).
A common understanding of these terms also supports this distinction. For instance, a neighborhood pawnshop that derives 95 percent of its income from interest on loans, as opposed to sales, is by no fair and accurate characterization a financial institution. Yet, it would seem equally clear that the same pawnshop may be a financial business. It accepts goods as collateral for interest chargeable loans to customers. In essence, it can be said that all financial institutions are financial businesses, but not all financial businesses are financial institutions. Simpson is not a financial institution, but it is a financial business for purposes of RCW 82.04.4281.
The Department, in Excise Tax Bulletin 571.04.146 (ETB 571), established an interpretive rubric through which to analyze section 4281 deduction claims.[14] The Department applied ETB 571 to Simpson. The Court of Appeals held that ETB 571 is consistent with the language of section 4281, as well as this Court's opinions in Sellen and Rainier, but that the Department misapplied it in this case. Simpson argues that ETB 571 deviates from this Court's opinions in Sellen and Rainier, as well as the language of section 4281, and therefore exceeds the Department's interpretive authority and steps into the realm of impermissible rule-making. See Fisher Flouring Mills Co. v. State, 35 Wash.2d 482, 492, 213 P.2d 938 (1950) ("an administrative agency may not, by means of an interpretive or clarifying regulation, actually modify or amend the statute in question.") We reject this contention and find it to be a proper interpretation of section 4281.
The Department of Revenue is the agency charged with interpreting and carrying out Washington's tax laws. RCW 82.32.300. Agencies charged with such duties are
encouraged to advise the public of its current opinions, approaches, and likely courses of action by means of interpretive or policy statements. Current interpretive and policy statements are advisory only.[[15]]
RCW 34.05.230(8).
This is precisely what the Department has done in ETB 571.
ETB 571 was issued by the Department on June 30, 1995. It prescribes a two-part inquiry in determining if a business is eligible for a section 4281 deduction. The first step of the test follows:
The first inquiry requires determining whether the primary purpose and objective of the taxpayer is to earn income through the utilization of significant cash outlays or whether these activities are merely "incidental" to the taxpayer's nonfinancial business activities. This inquiry is made by applying a percentage test. The Department conclusively presumes that the income is not from engaging in a financial business, but is incidental to the nonfinancial business activities, if the financial income *753 is five percent or less of the annual gross receipts. The percentage of financial income will be computed by including all calendar or fiscal year financial income from "loans and investments or the use of money as such" in the numerator, whether taxable, exempt, or deductible, and including all calendar or fiscal year revenues as normally measured by the B & O tax, including all revenues otherwise exempt or deductible, in the denominator.
....
If the first inquiry results in five percent or less of financial income in each of the years, it is unnecessary to proceed to the second inquiry. The taxpayer will not be considered as engaging in a "financial business". If the percentage exceeds five percent in any of the years, it is necessary to proceed with the second inquiry, but only for those years in which the percentage exceeds five percent.
ETB 571.04.146/109 (June 30, 1995).
The Interpretations and Appeals Division of the Departments concluded that Simpson did not come within the five-percent safe-harbor outlined above because, taking into account its subsidiary dividends, Simpson derives one hundred percent of its income from financial sources. The Court of Appeals disagreed, holding that Simpson falls within the five-percent safe-harbor provision because its subsidiary dividends are not financial income. For the reasons noted earlier in this opinion, the Court of Appeals' conclusion was in error. All of Simpson's income comes from financial sources.
Based on its finding, the Department proceeded to the second inquiry prescribed by ETB 571:
The second inquiry for determining when a taxpayer's activities constitute a "financial business" involves whether the taxpayer's activities are similar to, or comparable to, those of "banking, loan, [or] security businesses", even though the taxpayer might not technically fall within one of those three categories. The factors which will be considered include, but are not limited to, the source of the income, frequency of investments, volume of investments, percentage of income from investments in relation to the total income of the business, and the relationship of the investment income to the other activities of the business.
Id.
The Department found that multiple factors indicate Simpson is a financial business: (1) Simpson regularly earns income through investment of its subsidiaries' excess funds; (2) Interest income and dividends constitute most of Simpson's income; and (3) Simpson is not otherwise paid for its activities. This conclusion is the same as that reached in this opinion, and for good reason; with the exception of the five-percent safe-harbor test, ETB 571 is simply a reiteration of this Court's holdings in Sellen and Rainier. As such, ETB 571 was well within the Department's interpretive authority.
Although we specifically rejected a strict percentage test in Sellen and Rainier, the five-percent threshold in ETB 571 is merely a safe-harbor provision, presumably established in the interest of administrative expediency. It does not limit the scope of section 4281, in that it does not deny the deduction to anyone who would otherwise be eligible. Nor does it conflict with the language of section 4281 or this court's opinions by broadening the section 4281 deduction. Even under an expansive interpretation of the term "financial business," it is difficult to conceive of a business that would derive less than five percent of its income from financial sources and still be deemed a "financial business."
Holding that Simpson is a financial business for purposes of RCW 82.04.4281, we reverse the Court of Appeals.
GUY, C.J., SMITH, TALMADGE, IRELAND, JJ., and COLEMAN, J.P.T., concur.
ALEXANDER, J. (dissenting).
The Simpson Investment Company (Simpson) was not, at any time material to this appeal, engaged in "banking, loan, security, or other financial businesses" within the meaning of RCW 82.04.4281 (emphasis added). I would, therefore, affirm the Court *754 of Appeals, which properly concluded that Simpson could deduct any amounts it derived from investments when it computed its Business and Occupation (B & O) tax liability because Simpson's primary objective and purpose was to provide services to its subsidiaries in the timber, forest products, and plastic pipe businesses, not to earn income from its investments. Because the majority concludes otherwise, "finding that Simpson is a `financial business,'" I dissent. Majority op. at 744.
This court has looked at the term "financial business" on two prior occasions. Rainier Bancorporation v. Department of Revenue, 96 Wash.2d 669, 638 P.2d 575 (1982); John H. Sellen Constr. Co. v. Department of Revenue, 87 Wash.2d 878, 558 P.2d 1342 (1976). On both occasions, we held that the term "must be given its ordinary and common meaning," which "`contemplates a business whose primary purpose and objective is to earn income through the utilization of significant cash outlays.'" Rainier, 96 Wash.2d at 672, 673, 638 P.2d 575 (quoting Sellen, 87 Wash.2d at 882, 558 P.2d 1342). If we continue to accord the term "financial business" the common meaning we ascribed to it in those prior cases, Simpson cannot be said to be a "financial business" any more than were the taxpayers in Sellen.
In Sellen, the taxpayers[1] each invested a portion of their gross income in short-term investments that yielded income. The Department of Revenue took the position that these taxpayers owed B & O tax on the investment income. The taxpayers disagreed with the Department's position, contending that any investment income they earned was deductible from their gross income for purposes of computing the B & O tax. This court agreed with the taxpayers, concluding that they were not "financial businesses" and that, as a consequence, the investment income earned by them, which represented only a small percentage of their gross revenues, was not subject to the B & O tax. We said:
If we adopt appellant's interpretation of RCW 82.04.430(1),[[2]] then few taxpayers, if any, making incidental investments of surplus funds could receive the deduction. Appellant equates investing any income with being a financial business and, in effect, this renders the statute a nullity. By interpretation we should not nullify any portion of the statute.
Sellen, 87 Wash.2d at 883, 558 P.2d 1342 (citations omitted).
The record reflects that, like the taxpayers in Sellen, Simpson's primary purpose and objective was not to earn income through the utilization of significant cash outlays. Rather, it was to engage in a trade or business apart from its investment activities, activities which realized only a small percentage (less than five percent) of its gross revenues. More specifically, the record shows that Simpson was formed in 1985 as the parent holding company of Simpson Timber Company, Simpson Paper Company, Simpson Extruded Plastics Company, and Simpson Foreign Sales Company. Through the efforts of its 172 employees, Simpson provided various services to these subsidiaries, including "accounting/finance; credit; human resources; legal; management information services; public affairs; risk; tax; treasury; cash management; property management/real estate; land and timber; and corporate administration." Majority op. at 743. It did not charge the subsidiaries for any of these services.
The Department of Revenue contends that "Simpson earns 100 percent of its income from investment services." Pet. for Review at 3. This is simply not correct. Although Simpson did realize some funds from commodity futures trading, dividends from relatively small holdings of stock (approximately 100 shares) in competing forest products *755 companies,[3] and interest on moneys that its subsidiaries paid into a concentration account, the vast majority of its income was from dividends it received from its stockholdings in the subsidiaries to which it provided services.[4] If the dividends from subsidiaries are excluded from the equation, as they should since Simpson was providing services to those subsidiaries, it is clear that the income Simpson made from investments is merely incidental and the receipt of it does not transform Simpson into a financial business.
While Simpson's management of its concentration account may appear on the surface as sophisticated high finance, it really is nothing more than adept cash management that enabled it to earn interest on liquid funds that it had on deposit each day. As the Court of Appeals aptly noted, "Simpson is not in competition with financial businesses.... [I]ts receipt of interest from overnight bank account deposit of surplus funds is an `incidental' activity that is not essentially in competition with financial businesses. Simpson is merely a bank customer, receiving, not performing, normal banking services." Simpson Inv. Co. v. Department of Revenue, 92 Wash.App. 905, 922, 965 P.2d 654 (1998), review granted, 137 Wash.2d 1032, 980 P.2d 1284 (1999).
The majority determines that Simpson is a financial business because, in its opinion, Simpson is providing services to its subsidiaries in order to increase the value of its investment in its subsidiaries. From this determination the majority goes on to hold that "Simpson's primary purpose and objective is to earn income through the utilization of significant cash outlays," the cash outlay being the ownership investment in the subsidiaries. Majority op. at 749. This conclusion simply does not hold up because the plain fact is that Simpson is not making significant cash outlays. Rather, it is providing managerial and support services to its subsidiaries. The majority, while recognizing that Simpson's purpose is to provide these services, sweeps this fact aside, content to observe that the relevant question "is not what Simpson does, but why it does it." Majority op. at 748. This is unsatisfactory.
In reality, Simpson is simply a classic holding company that owns the stock of its subsidiaries for the purpose of influencing the policies and the management of those wholly owned companies. It is not, despite its name, an investment company. If it is, it is hard to conceive of any holding company that would not be deemed a "financial business." To hold, as the majority does, that Simpson is making significant cash outlays when it provides those services conflicts with the policy of excluding dividends from subsidiaries as taxable income for B & O tax purposes. RCW 82.04.4281.
The majority acknowledges that some of the various services Simpson furnishes to its subsidiaries are nonfinancial. It also concedes that if these "services were provided in-house by a corporation that was manufacturing a product or selling a retail service, the rendering of these services would not in and of itself make it a `financial business.'" Majority op. at 748. Although Simpson does not charge a fee to its subsidiaries for these services, it renders the services in order to influence the management of these companies. The fact that its skillful management of the subsidiaries may result in receipt of increased dividends, which are not subject to the B & O tax, does not convert Simpson into a financial business.
The weakest link in the majority's decision is its holding that Simpson is comparable to a bank, loan company, or security business. While the majority acknowledges that under Sellen only businesses that can be said to be "comparable" to banking, loan, and security businesses may be deemed a financial business, it concludes that there is comparability *756 because "Simpson makes money through its ownership of subsidiary and competitor stock, earns interest income from the overnight investment of subsidiary funds, and engages in price hedging and futures trading." Majority op. at 750. Simpson, in fact, makes a relatively small amount of money from interest income, dividends on small holdings of competitors' stocks, and futures trading. That it earns this investment income hardly makes it comparable to a bank, loan company, or security business. The majority essentially concedes that point, noting that under Sellen the receipt of such a small percentage of investment income would not support a finding that the company receiving the income was a financial business. Not to be deterred, the majority goes on to say that the dividends Simpson receives or the stock it holds in its subsidiaries are investment income, indicating that "we find the Legislature intended that subsidiary dividends be taken into account in determining if a business is a `financial business.'" Majority op. at 751 (citing Group Health Coop. v. Washington State Tax Comm'n, 72 Wash.2d 422, 429, 433 P.2d 201 (1967)). Although the majority goes through a rather elaborate analysis to divine the intent of the Legislature in this regard, its construction of the statute defies a commonsense reading and leads to an absurd result that would effectively eliminate the investment income deductions for any holding company. Such a result flies in the face of our decision in Sellen.[5]
In sum, the majority's determination is akin to an attempt to pound a square peg into a round hole. Simpson is not a financial business. While it makes a small amount of money from skillful management of its cash and from futures trading and dividends on stock in competing companies, this amount is relatively small and does not make Simpson a financial business. Furthermore, Simpson is simply not comparable to a bank, loan company, or security company. It has none of the earmarks of such a business. It is, in reality, a holding company that provides services to its subsidiaries. As such, its investment income is not subject to the B & O tax. If the Legislature should someday conclude that this income should be subject to the reach of that tax, it can easily amend the statute. In the meantime, this court should resist the temptation to amend it. We should affirm the Court of Appeals. Because we do not, I dissent.
JOHNSON and SANDERS, JJ., concur.
NOTES
[1] Simpson's name, "Simpson Investment Company," would at first blush seem to resolve the issue presented in this case, i.e., is Simpson a "financial business." Recognizing this point, Simpson explains that the term "investment company" has historical significance to the Simpson family of companies because it was the name adopted for the first corporate family holding company in the early twentieth century.
[2] Simpson Extruded Plastics was sold in September of 1991.
[3] Employee numbers are as of 1995.
[4] Simpson also derives a small amount of income from notes and contracts.
[5] This figure represents the number of shares owned by Simpson in 1993.
[6] Prior to July 1, 1993, RCW 82.04.290(1) specified that the "other business or service activities" tax rate was to be imposed on all persons engaging in a business activity other than, or in addition to, those enumerated in other sections of the law (i.e., extracting, manufacturing, retailing, wholesaling, etc.). A similar provision is now found in the current RCW 82.04.290(2). The Legislature amended RCW 82.04.290 in 1993, resulting in several new B & O tax reporting classifications, which resulted in a changed tax rate for "financial businesses." Beginning July 1, 1993, RCW 82.04.290(2) imposed a "financial business services" tax on the income of "financial businesses," which was defined as a tax upon any "person engaging within this state in banking, loan, security, investment management, investment advisory, or other financial businesses...." Laws of 1993, 1st Sp. Sess., ch. 25, § 203. At some point after this amendment, Simpson began reporting under the "financial business services" classification, which resulted in a lower tax rate to Simpson. The Department claims that this characterization supports its position that Simpson is in fact a "financial business." This argument falls on the simplest of grounds. As the Court of Appeals correctly noted, "Simpson reported under the `financial businesses' classification because the Department insisted that Simpson was a `financial business' and that Simpson pay the corresponding B & O tax." Simpson Inv. Co. v. Department of Revenue, 92 Wash.App. 905, 915-16, 965 P.2d 654 (1998). During this same period Simpson continued to contest the Department's assessment, seeking redress through administrative appeals and court action. The "financial business services" provision has since been repealed.
[7] Person is defined by RCW 82.04.030 to include corporations.
[8] At the time of both John H. Sellen Const. Co. v. Department of Revenue, 87 Wash.2d 878, 558 P.2d 1342 (1976) and Rainier Bancorporation v. Department of Revenue, 96 Wash.2d 669, 638 P.2d 575 (1982), the current section 4281 was codified at RCW 82.04.430(1). In 1980, the Legislature separated out most sales, use, and B & O tax deduction and exemption statutes into separate sections. RCW 82.04.430(1) thus became the current RCW 82.04.4281. Laws of 1980, ch. 37, § 2. The Legislature's action was designed" to improve the readability and facilitate the future amendment of these sections. This separation shall not change the meaning of any of the exemptions or deductions involved." Laws of 1980, ch. 37, § 1. Throughout this opinion all references are made to section 4281, rather than its predecessor.
[9] This statement may have been a factual error. One of the taxpayers in Sellen, AMPPCF, was a trust corporation established for a charitable purpose. It is difficult to ascertain how a trust fund would only receive a small percentage of its income from investment sources. We presume that Sellen was referring to the ratio of trustee fees to the investment income of the trustee. This income was presumably distinct from the investment income of the trust corpus itself, which is ultimately income to the beneficiary.

Additionally, as noted by the Association of Washington Business (AWB), appearing as Amicus Curiae, AMPPCF's activities, as a trust corporation, seem to be financial in nature. Nevertheless, the Sellen court highlighted the charitable purposes of AMPPCF suggesting its decision may have been influenced by that fact.
[10] In Rainier, this Court noted that in Sellen "the amount of investment income as compared to the total gross income of each taxpayer ... constituted less than 1 percent of the total." Rainier, 96 Wash.2d at 673 n. 2, 638 P.2d 575. This was a misstatement of Sellen's facts. See Sellen, 87 Wash.2d at 880, 558 P.2d 1342 ("these investments produced income representing approximately 3 percent of respondent's gross revenues").
[11] Simpson cites three cases from other jurisdictions in support of its argument that holding companies are not financial businesses. None of these cases is persuasive. Each dealt with a statutory scheme quite different from Washington's. See Marble Mortgage Co. v. Franchise Tax Bd., 241 Cal.App.2d 26, 50 Cal.Rptr. 345 (1966) (mortgage company is a "financial corporation" for purposes of California Revenue and Taxation Code, section 23183, a provision providing less favorable tax treatment to banks and financial corporations.); International Thomson Bus. Info., Inc. v. Director, Div. of Taxation, 14 N.J.Tax 424 (1995) (holding corporation is not an "investment company" for purposes of New Jersey law that provides favorable tax treatment to investment companies.); United States Steel Corp. v. Gerosa, 7 N.Y.2d 454, 166 N.E.2d 489, 199 N.Y.S.2d 475 (1960) (New York based holding company is not a "financial business" under definition provided within a statute authorizing legislators of cities to impose tax on persons carrying on financial businesses.)
[12] The AWB argues that if the term "financial business" is broadly defined holding companies will move their treasury functions out of state. Even if this fact were relevant to this court's legal analysis, which it is not, the AWB has failed to cite to any state in the nation that would provide more favorable tax treatment to these companies and therefore, cause this claimed mass exodus.
[13] The AWB argues that the term "financial business" should only encompass those businesses that hold themselves out to the public as engaged in financial business, not those businesses that are simply engaged in financial activities. Essentially, the AWB is asking this Court to apply section 4281 only to financial institutions. Sellen and Rainier, as well as the text of section 4281, indicate that a broader interpretation is warranted. The inquiry is whether a business is "comparable to" a banking, loan, or security business. As a matter of common understanding the phrase "comparable to" is more expansive than the phrase holding themselves out to the public as.
[14] Excise Tax Bulletin (ETB) 571 was actually in response to Determination 93-269ER, 14 WTD 153 (1995), a determination that overruled all prior determinations inconsistent with its rationale and established a "safe harbor" or "bright line" test, nearly identical to the one released shortly thereafter in ETB 571.
[15] "`Interpretive statement' means a written expression of the opinion of an agency, entitled an interpretive statement ... as to the meaning of a statute or other provision of law, of a court decision, or of an agency order." RCW 34.05.010(8). "`Policy statement' means a written description of the current approach of an agency, entitled a policy statement ... to implementation of a statute or other provision of law, of a court decision, or of an agency order, including where appropriate the agency's current practice/procedure, or method of action based upon that approach." RCW 34.05.010(15).
[1] The taxpayers were John H. Sellen Construction Company, Acacia Memorial Park, Acacia Memorial Park Permanent Care Fund, King County Medical Blue Shield, Olympia Brewing Company, and Blue Cross Washington-Alaska, Inc.
[2] Former RCW 82.04.430(1) was recodified as RCW 82.04.4281.
[3] The stock it owns in competing corporations is apparently held for the purpose of allowing Simpson to keep abreast of its competitors' activities, rather than for investment purposes. As the majority points out, on two occasions Simpson held large amounts of stock in two competing corporations, Longview Fibre Company and Palmer G. Lewis. It concedes that its holdings in these two corporations were for investment purposes.
[4] The B & O tax does not apply to dividends received by a parent company from its subsidiary. RCW 82.04.4281.
[5] In Rainier, we concluded that Rainier was comparable to a bank, loan company, or security business. That holding is entirely understandable since, as the Court of Appeals noted, Rainier did make loans to its subsidiaries, for which it charged interest.