Honorable Bob Morton State Senator, 7th District P.O. Box 40482 Olympia, WA 98504-0482
Dear Senator Morton:
By letter previously acknowledged, you have requested our opinion on the following question, which we have paraphrased as:
Would any or all of the following conservation measures, ifinstalled by current customers of a public utility district,result in the conversion from one energy source to another suchthat the public utility district would be prohibited byarticle VIII, section 10 of the Washington Constitution or RCW 54.16.280from financing them:
1) pellet stoves;
2) solar systems;
3) wind turbines;
4) geothermal systems; or
5) mini-hydroelectric generating systems?
 BRIEF ANSWER
Each of the measures identified above results in the conversion from one energy source to another. Therefore, we conclude that article VIII, section 10 and RCW 54.16.280 do not authorize a PUD to finance them as energy conservation measures. A PUD would need authority under other constitutional and statutory provisions if such measures were to be financed by a PUD.
 BACKGROUND
Public utility districts (PUDs) are municipal corporations authorized by statute. RCW 54.04.020. Municipal corporations may exercise only those powers expressly granted by statute, those powers that are necessarily or fairly implied in or incident to express powers, and those powers essential to the declared objects and purposes of the corporation. Hite v. PUD 2, 112 Wn.2d 456,458-59, 772 P.2d 481 (1989). If there is a doubt as to whether the power is granted, it must be denied. Port of Seattle v. Wash.Util. Transp. Comm'n, 92 Wn.2d 789, 795, 597 P.2d 383 (1979).See also AGO 1998 No. 14, at 2. However, when a public utility is acting in its proprietary capacity, its authority is liberally construed:
 We have viewed the Legislature as implicitly authorizing a municipality to make all contracts, and to engage in any undertaking necessary to make its municipal electric utility system efficient and beneficial to the public. . . . In addition, we have traditionally viewed an express grant of proprietary authority as implying those `powers . . . necessarily or fairly implied in or incident to [express powers] and also those essential to the declared objects and purposes of the [municipal] corporation.'
City of Tacoma v. Taxpayers of Tacoma, 108 Wn.2d 679, 694-95,743 P.2d 793 (1987) (citations omitted). Thus, when a PUD acts like a business-such as in producing and selling power-its authority is liberally construed. See Id.; see also AGO 1988 No. 14, at 2-3.
However, there are limits to a public utility's exercise of its proprietary authority. The Washington Supreme Court has held:
 Of course, [a municipal utility's] authority has limits. In exercising its proprietary power, [a municipal utility] may not act beyond the purposes of the statutory grant of power . . . or contrary to express statutory or constitutional limitations. . . . Thus, if municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply, this court leaves the choice of means used in operating the utility to the discretion of municipal authorities. We limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious[.]
City of Tacoma, 108 Wn.2d at 695 (citations omitted). If a PUD is relying on the authority of article VIII, section 10 of the Washington Constitution and RCW 54.16.280 to offer its customers financing for equipment that will result in conservation or more efficient use of energy, its exercise of that authority must be consistent with these provisions. Because your request asks whether a PUD may finance energy conservation measures on its customers' property, we focus our analysis to the question of whether such loans are authorized by article VIII, section 10 or RCW 54.16.280.
 ANALYSIS
Article VIII, section 10 of the Washington Constitution provides:
Notwithstanding the provisions of section 7 of this Article, any county, city, town, quasi municipal corporation, municipal corporation, or political subdivision of the state which is engaged in the sale or distribution of water, energy, or stormwater or sewer services may, as authorized by the legislature, use public moneys or credit derived from operating revenues from the sale of water, energy, or stormwater or sewer services to assist the owners of structures or equipment in financing the acquisition and installation of materials and equipment for the conservation or more efficient use of water, energy, or stormwater or sewer services in such structures or equipment. Except as provided in section 7 of this Article, an appropriate charge back shall be made for such extension of public moneys or credit and the same shall be a lien against the structure benefited or a security interest in the equipment benefited. Any financing for energy conservation authorized by this article shall only be used for conservation purposes in existing structures and shall not be used for any purpose which results in a conversion from one energy source to another.
This provision was adopted in 1979 as Amendment 70. By its terms, Amendment 70 expired on January 1, 1990. Const. art. VIII, § 10 (amend. 70).
In 1988, voters adopted Amendment 82, which ensured the continuation of a public utility's authority to finance conservation measures beyond January 1, 1990. Const. art. VIII, § 10 (amend. 82); see also Voters Pamphlet 12 (1988). This amendment also added to article VIII, section 10 the following sentence: "Any financing [for energy conservation] authorized by this article shall only be used for conservation purposes in existing structures and shall not be used for any purpose which results in a conversion from one energy source to another."
Following the enactment of Amendment 82, the Legislature amended RCW 54.16.280 to read:
Any [public utility] district is hereby authorized, within limits established by the Constitution of the state of Washington, to assist the owners of structures or equipment in financing the acquisition and installation of materials and equipment, for compensation or otherwise, for the conservation or more efficient use of energy in such structures or equipment pursuant to an energy conservation plan adopted by the district if the cost per unit of energy saved or produced by the use of such materials and equipment is less than the cost per unit of energy produced by the next least costly new energy resource which the district could acquire to meet future demand. Any financing authorized under thischapter shall only be used for conservation purposes in existingstructures, and such financing shall not be used for any purposewhich results in a conversion from one energy source to another.
Laws of 1989, ch. 268, § 2 (emphasis added). Conservation loan financing programs must be consistent with the conditions set forth in the statute. See City of Tacoma, 108 Wn.2d at 691
(construing RCW 35.92.360).
Your question asks whether several measures result in the conversion from one energy source to another such that a PUD would be prohibited from financing them. In answering that question, we must determine the meaning of "conversion" and "energy source" as used in article VIII, section 10 and RCW 56.14.280.
We are aided by familiar principles of statutory construction in answering this question. Where words in a statute are not defined, they are given their plain and ordinary meaning. See Simpson Inv.Co. v. Dep't of Rev., 141 Wn.2d 139, 150, 3 P.3d 741 (2000). Courts often look to a dictionary to discern the plain and ordinary meaning of a word. See Ravenscroft v. Wash. Water PowerCo., 136 Wn.2d 911, 922, 969 P.2d 75 (1998). The word conversion
is defined as a "change from one form, state, or character into another". Webster's Third New International Dictionary 499 (1993). However, the word conversion also means "a change from one thing to another by substitution." Id. One definition implies a change in form or character; the other is more inclusive. Therefore, the word conversion has more than one meaning.
In the context of article VIII, section 10, the word "source" also has more than one meaning. The dictionary defines "source" as "a point of origin or procurement". Id. at 2177. Thus, "energy source" could mean the genesis of energy, or the entity from which it is purchased.
Where, as here, the meaning of a constitutional provision cannot conclusively be determined by use of the dictionary, the provision is ambiguous and it is proper to look to the legislative history and Voters Pamphlet to interpret it. Zachman v. WhirlpoolFinancial Corp., 123 Wn.2d 667, 671, 869 P.2d 1078 (1994); seealso State v. McGee, 122 Wn.2d 783, 787, 864 P.2d 912 (1993) (a statute is ambiguous when it is subject to two or more reasonable interpretations).
When it was originally presented to the voters in 1979, article VIII, section 10 was intended to authorize loans for the installation of electricity-saving materials, such as insulation, weather-stripping, and storm windows. Voters Pamphlet 16 ("Statement For") (1979). The Voters Pamphlet also stated that one purpose of the amendment was to rectify the inequity that private (investor-owned) utility companies "already offer low interest loans to their residential customers for insulating their homes" and that public utilities were "prohibited" from doing so. Id.
When article VIII, section 10 was amended in 1998, the "Statement For" in the Voters Pamphlet explained the proviso regarding the financing of conservation measures that would result in a conversion from one energy source to another as a limitation on the public utility's authority to finance such measures:
 HJR 4223 carefully limits conservation loan programs. No tax dollars are involved. Only funds from the sale of electricity can be used for conservation loans.
 Loans can be used only for the purchase and installation of energy conservation materials. They cannot be used to change from one energy source to another.
Voters Pamphlet 12 (1988). The broad language in the Voters Pamphlets indicates the voters would have understood this provision did not contemplate conservation measures that would result in a change in either the kind of energy or the provider of energy.
In addition, the legislative history shows that the Legislature considered "energy source" very broadly, to include both the kind of energy and the entity that provides the energy. The floor debate focused on a concern that public utilities would offer loan incentives to customers to allow them to switch from a private utility to the public utility. HJR 4223, Senate Floor Debate (March 5, 1988). The debate also included discussion that the amendment was intended to prevent the transfer from one energy lode to another. Id. Thus, not only was the Legislature addressing the issue of who provided the energy, but also what kind of energy the PUD customer must use to be eligible for financing.
Thus, we believe the better interpretation of article VIII, section 10 is that a PUD cannot offer customers loans to switch from using energy supplied by the PUD to energy supplied by another source, including energy generation facilities installed by the customer. Nor can a PUD provide financing for materials or equipment that would result in a change from the kind of energy used-for example, from electricity to another kind of energy.
You have noted that the Legislature, in RCW 43.19.670(2), defined "energy conservation measure" for purposes of that statute to include alternative energy sources, such as solar heating systems. RCW 43.19.670(2)(e) (pertaining to energy conservation in buildings owned or leased by the state). However, this statute does not change our reading of article VIII, section 10, which authorizes financing for energy conservation projects within limits. Thus, even if a project is an energy conservation project, it still cannot be financed under the authority of this constitutional provision if the funds would be used for conversion from one energy source to another.
Courts will construe constitutional provisions to avoid rendering any part of them superfluous. State ex rel. Heavey v. Murphy,138 Wn.2d 800, 811-12, 982 P.2d 611 (1999). Defining "conservation" in article VIII, section 10 to allow the use of an alternative energy source would make the words "shall not be used for any purpose which results in a conversion from one energy source to another" superfluous. Therefore, the definition of "energy conservation measure" set forth in RCW 43.19.670(2) is inapplicable to article VIII, section 10 and RCW 54.16.280.
We turn now to your question of whether a PUD may finance the specific measures listed in your request. In our opinion, each of the energy measures listed would result in a change from one energy source to another, as a change in both the kind of energy and the provider of energy. For example, use of a pellet stove results in a change from electric heat to wood-burning heat. Although wind turbines and solar systems may be designed in a way to generate electricity, they would result in a change from electric power to solar or wind power and would result in the customer no longer receiving the energy from the same source — the PUD. Therefore, the project falls outside those which article VIII, section 10 would allow.
In summary, it is our opinion that under article VIII, section 10
of the Washington Constitution and RCW 54.16.280, a PUD cannot finance the purchase or installation of equipment that would result in a change from one energy source to another. Pellet stoves, solar systems, wind turbines, geothermal systems, and mini-hydroelectric systems all result in a change from one energy source to another; therefore, a PUD may not finance them. As noted above, we do not reach the issue whether such a program might be undertaken based upon some authority which is not based on article VIII, section 10.
We trust this opinion is of assistance to you.
Sincerely,
SHANNON E. SMITH Assistant Attorney General